Maurice M. LARRY, Plaintiff-Appellant,

v.

Ray E. LAWLER, Leland L. Walton, Jayne B. Spain, Lt. Andolsek, Robert E. Hampton, Defendants-Appellees.

No. 76–1747.

United States Court of Appeals, Seventh Circuit.

Aug. 18, 1978.*

* The unpublished order issued on August 18, 1978, has now been converted to a citable opinion.

Amy Hilsman, Chicago, Ill., for plaintiff-appellant.

Thomas P. Sullivan, U.S. Atty., Martin B. Lowery, Asst. U.S. Atty., Chicago, Ill., for defendants-appellees.

Before SWYGERT and WOOD, Circuit Judges, and EAST, Senior District Judge.**

EAST, Senior District Judge.

Plaintiff-appellant Maurice M. Larry (Larry) appeals the district court's order entered on May 21, 1976 which granted defendants-appellees' motion for summary judgment.

Larry was rated ineligible for employment in the federal government by the Civil Service Commission. After an unsuccessful administrative appeal concluded on February 14, 1975, Larry filed this 5 U.S.C. § 702 (Administrative Procedure Act) suit naming the hearing officers and Civil Service Commissioners (Commission) as defendants, primarily alleging that the manner in which the Commission reached its ultimate decision constituted a violation of the Due Process Clause of the Fifth Amendment. We vacate the summary judgment and remand.

*PROCEEDINGS BEFORE THE COMMISSION:*

On January 24, 1974, Larry applied to the Commission requesting to be placed on the list of eligible applicants for employment consideration by the various agencies and departments within the federal government. As required by 5 C.F.R. § 731.301, the Commission conducted a standard background investigation to determine the applicant's "qualifications and suitability for employment in the competitive service."

Upon completion of the investigation, the Commission provided Larry with a summary entitled "Information Disclosed by Investigation into the Case of Maurice Larry" and invited comments and explanation. The information concerned Larry's employment history, his relationships with co-workers, his arrest record, and information relating to his use of alcohol.[1]

Shortly thereafter, Larry responded in writing to all the allegations, denying several of the findings and explaining the others. He also requested an oral hearing and access to the information upon which the Commission based its decision, including its sources. After considering Larry's response, the Commission rated the application ineligible because of "unsatisfactory employment record discharges from employment and [Larry's] habitual use of intoxicating beverages to excess."[2] The effect of this finding is to bar Larry from obtaining employment in any capacity with the federal government for a period of up to three years.[3]

Larry then appealed the decision to the United States Civil Service Commission Federal Employee Appeals Authority, again requesting an oral hearing and the additional information. Additionally, he reiterated his contentions concerning the investigative findings. A final administrative decision was rendered denying the appeal and concluding that Larry's conduct, performance and termination from past employment

** Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

1. The investigator's report (edited to conceal identities) from which the summary was compiled was not given to Larry until after the administrative proceedings were completed. It is, therefore, of no consequence in the determination of this case that he was later supplied with the report.

2. 5 C.F.R. § 731.201 provides that "Subject to Subpart C [Suitability Rating Actions] of this part the Commission may deny an applicant examination, deny an eligible appointment, and instruct an agency to remove an appointee when the Commission determines this action will promote the efficiency of the service."

5 C.F.R. § 731.202 lists numerous "specific factors" that may be used in the determination of eligibility. Among those considered sufficient to support a denial of eligibility are (b)(1) "Delinquency or misconduct in prior employment" and (b)(5) "Habitual use of intoxicating beverages to excess."

3. 5 C.F.R. § 731.303. Debarment. "When a *person is disqualified for any reason named in* § 731.202, the Commission, in its discretion, may deny that person examination for and appointment to a competitive position for a period of not more than three years from the date of determination of disqualification. On expiration of the period of debarment, the person who has been debarred may not be appointed to any position in the competitive service until his fitness for appointment has been redetermined by the Commission."

tended to "raise some question, however, indeterminate, relative to incompatibility" with suitable performance.

## DISTRICT COURT PROCEEDINGS:

Larry's three count complaint in the district court alleged an unconstitutional denial of due process, arbitrary, capricious, and unauthorized action by the Commission, and findings unsupported by the evidence. The district court granted appellees' motion for summary judgment on all three counts.

## DISCUSSION AND CONCLUSIONS:

Larry contends that as an applicant, he should have been allowed to examine all the evidence underlying the Commission's allegations against him and that he should have been granted an oral hearing in order to allow him to effectively rebut the adverse evidence. Further, he contends that the adverse eligibility ruling has stigmatized him and has barred him from all federal employment for up to three years. Larry argues that such action amounts to a denial of due process guaranteed by the Fifth Amendment.

■ In addressing a claim of an unconstitutional denial of procedural due process, we undertake a two step analysis. Initially, it must be determined whether Larry's interest rises to the level of a constitutionally protected "liberty" or "property" interest. If there is a recognizable property or liberty interest at stake, then we must weigh the competing interests of the individual and the Government in order to reach a resolution of what process is due.

In making a determination of whether the Fifth Amendment's due process requirements are to be applied, "we must look not to the 'weight' but to the *nature* of the interest at stake." *Board of Regents v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972). Roth, a non-tenured teacher at a state university, alleged his due process rights were violated when the school failed to provide him with a statement of reasons or a hearing when it declined to renew his one year contract. The Supreme Court held that there was no constitutional violation because nonrenewal deprived him of neither liberty nor property. In its discussion of the nature of liberty, the court stated:

"While this Court has not attempted to define with exactness the liberty . . . guaranteed . . . the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399 [43 S.Ct. 625, 626, 67 L.Ed.2d 1042]. In a Constitution for a free people, there can be no doubt that the meaning of "liberty" must be broad indeed. *Id.* at 572, 92 S.Ct. at 2706.

■ The court suggested a two-pronged liberty interest. Initially, liberty may be implicated if charges are leveled against an employee which "might seriously damage his standing and associations in his community," and the court gives as an example accusations of dishonesty or immorality. *Id.* at 573, 92 S.Ct. at 2707. The court continued that "[i]n such a case, due process would accord an opportunity to refute the charge before University officials." *Id.*

Secondly, the court explained that liberty may also be abridged if "the State, in declining to re-employ the respondent, imposed on him a *stigma or other disability* that foreclosed his freedom to take advantage of other employment opportunities. The State, for example, did not invoke any regulations to bar the respondent from all other public employment in state universities. Had it done so, this, again, would be a different case. For '[t]o be deprived not only of present government employment but of future opportunity for it certainly is no small injury . . . .' " *Id.* at 573–74, 92 S.Ct. at 2707. (Emphasis added).

The nature of Larry's liberty interest is difficult to define with exactitude. He has been charged with drunkenness and abusive behavior, as a basis for the Commission's denial, and the effect of the negative eligibility finding is to bar him from all federal employment, a significant sector of the job market, for up to three years. The Commission points out that its findings will not be made public and are made available to the various agencies only on a need to know basis. However, the federal government is composed of many different agencies and departments, all of which could obtain the information under various circumstances.[4] In effect, Larry has been stigmatized throughout the entire federal government. He is deprived of the opportunity to work in any capacity for any branch of the government.

It must be remembered that Larry has not merely been denied a particular position within the government; he has been totally debarred from all federal employment for up to three years. As Justice Jackson stated in his concurrence in *Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 185, 71 S.Ct. 624, 95 L.Ed. 817 (1951), a case in which the petitioner organizations were, without notice or hearing, declared to be disloyal: "To be deprived not only of present government employment but of future opportunity for it certainly is no small injury when government employment so dominates the field of opportunity."

The recent Supreme Court case of *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), does not eliminate the need for an analysis of Larry's liberty interest. *Davis* held that a liberty interest is not

implicated when the only injury suffered as the result of government action is a stigma or damage to reputation.

While we have in a number of our prior cases pointed out the frequently drastic effect of the "stigma" which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from *some more tangible interests such as employment*, is either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause. At 701, 96 S.Ct. at 1161. (Emphasis added).

Unlike *Davis*, Larry has, in addition to the infliction of a stigma, suffered a tangible loss in being foreclosed from any consideration for government employment for a substantial time.

*Roth* cautions that not all foreclosures of opportunities establish a deprivation of liberty. 408 U.S. at 570, 92 S.Ct. 2701. The court stated:

[O]n the record before us, all that clearly appears is that the respondent was not rehired for one year at one university. It stretches the concept too far to suggest that a person is deprived of "liberty" when he simply is not rehired in one job but remains as free as before to seek another. At 575, 92 S.Ct. at 2708.

This court in *Adams v. Walker*, 492 F.2d 1003 (7th Cir. 1974), dealt with an alleged violation of due process when the Governor of Illinois removed the chairman of a state commission. Although no violation of due process was established, the court's language is illustrative of what would be considered a due process violation:

4. 40 Fed.Reg. 39246, 39247 (Aug. 27, 1975), governing the disclosure of personnel investigation records, provides in part:

Routine uses of records maintained in the system including categories of users and the purposes of such uses: The contents of these records and files may be disclosed and used as follows:

a. To designated officers and employees of other agencies and departments of the Federal Government, and the District of Columbia Government, having an interest in the individual for employment purposes, including a

security clearance or access suitability, and loyalty to the United States Government.

. . . . .

h. To a Federal agency, in response to its request, in connection with the letting of a contract, or the issuance of a license, grant, or other benefit by the requesting agency, to the extent that the information is relevant and necessary to the requesting agency's decision on matters.

It should be noted that Larry has previously been the recipient of such contracts and grants.

We are satisfied that plaintiff has failed to state a claim under either branch of the *Roth* liberty test. An unelaborated charge of "incompetence, neglect of duty and malfeasance in office" is of a different order of magnitude than charges of dishonesty, immorality, disloyalty, Communism, subversive activities, alcoholism or narcotics violations. . . . And nothing in the complaint even remotely suggests a legal barrier to future employment analogous to denial of admission to the bar, disqualification from all government employment . . . . At 1008–09.

*See Mazaleski v. Treusdell,* 183 U.S.App. D.C. 182, 562 F.2d 701 (1977). We hold that the loss of future employment opportunities coupled with the stigma now burdening Larry amounts to a foreclosure of opportunities reaching the level of a "liberty" interest to be afforded constitutional protection through due process.

We now turn to the question of what process is due.

The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. . . .

[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action. *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 1749, 6 L.Ed.2d 1230 (1961).

"The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss,' *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 168 [71 S.Ct. 624, 95 L.Ed. 817] (1951) (Frankfurter, J., concurring), and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication." *Goldberg v. Kelly,* 397 U.S. 254, 262–63, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970).

This approach has recently been refined in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 478 (1976), which lays out three elements to be considered in a determination of the governmental and private interests affected.

[O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. At 334–35, 96 S.Ct. at 903.

Examining these factors separately, we find first that the private interest affected is Larry's loss of all future employment opportunities with the federal government for a period of up to three years.[5] He also asserts that his reputation has been damaged and that the appellees have caused a stigma to attach in that his ineligibility rating charged him with "abusive treatment of your colleagues and associates," and labeled him an "habitual and excessive user of intoxicants." There is no doubt as to the severity of these Commission findings. While we note that the publication of the unsuitability ratings and findings is not as widespread as in *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), where a notice was posted in all state liquor stores that a given individual was an "excessive drinker," there still is the possibility of substantial dissemination. (*See* footnote 4, *supra,* at p. 958).

---

5. As the Supreme Court recognized in *Fusari v. Steinberg,* 419 U.S. 379, 389, 95 S.Ct. 533, 540, 42 L.Ed.2d 521 (1975), "the possible length of wrongful deprivation . . . is an important factor in assessing the impact of official action on the private interests."

■ Secondly, in any administrative proceeding, there is always some risk of an erroneous decision. This is particularly true where, as here, the information used as the basis of the Commission's decision comes from a source whose reliability or veracity is brought into question by the applicant. Upon completion of the investigation, the Commission sent Larry a summary of the information gathered inviting his comment.[6] Larry made several requests to the Commission in an attempt to learn the identities of his accusers and the specifics of his misconduct. The Commission refused to name sources or give dates and places of claimed misconduct, although the informants were identified as "co-residents, former co-workers and employment supervisors." Thus the field of adverse information as well as favorable information was somewhat narrowed for Larry's inquiry and gathering of information in the preparation of his response to the Commission. Larry avoided a straightforward clear-cut denial of the charges of alcoholism, stressing that he had become a changed man. He did deny, however, the other charges.[7] He also submitted statements by associates denying some of the charges and tending to establish his good character.

■ The third element is a consideration of the Government's interest. The *Mathews* formulation includes among the Government's interests to be considered "the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335, 96 S.Ct. at 903. Manifestly, the Government has a very substantial interest in assuring a correct determination of an applicant's suitability for federal employment, and the Commission is charged with the responsibility of assuring that all applicants will "promote the efficiency of the service." 5 C.F.R. § 731.201. The Supreme Court in *Sampson v. Murray*, 415 U.S. 61, 83, 94 S.Ct. 937, 949–950, 39 L.Ed.2d 166 (1974), where a probationary employee challenged her dismissal, reiterated "the well-established rule that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs,' *Cafeteria Workers v. McElroy*, 367 U.S. 886, 896 [81 S.Ct. 1743, 6 L.Ed.2d 1230] (1961). . . ." One method utilized by the Commission to assure high standards is a routine background investigation of all applicants. Much information is gained from past associates and employers on promises of confidentiality. Were the Commission unable to give such

---

6. A portion of the summary addressed information acquired by the Commission concerning Larry's use of alcohol. It stated: "The Commission has received the following information:
   "Persons who have knowledge of you as co-resident and former co-workers/employment supervisors advise, variously, that you have had *a continuing drinking problem and have been a habitual and excessive user of intoxicants over the past five years to date*. Information indicates that you are frequently in a state of intoxication and have been seen staggering under t the [*sic*] influence of alcohol on many occasions to the point where you are barely able to stand. You have been observed in your residence apartment's vicinity sipping from a paper bag. At your employments, you had the reputation of being a drunk, and you came to the office under the influence of alcohol on many occasions, the smell of alcohol on your breath. Your inebriation was noticeable and distracting to persons in the office, and you were often surly, obnoxious and rude to others. You were frequently absent or late and often unreachable by office personnel, claiming that you had

been to some meeting or seminar, but no one knew specifically where or when."
Additionally, Larry was asked to comment on evidence that one of the reasons for his termination from a former job was that "[t]here is evidence of abusive treatment by you of your colleagues and associates within the Center for *Urban Studies, including threats of personal harm*."

7. The reason for notice and an opportunity for response when the charge is stigmatization and foreclosure of employment opportunities is "'an opportunity to refute the charge . . .' [and] '. . . to provide the person an opportunity to clear his name.'" *Codd v. Velger*, 429 U.S. 624, 627, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977), quoting *Board of Regents v. Roth*, 408 U.S. 564, 573 & n.12, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Despite the fact that Larry's denials, at times, are less than specific, he does not run afoul of *Codd* where it was held that the failure to allege the falsity of a damaging report was fatal to a claim for a hearing under the Due Process Clause.

assurances of confidentiality, the investigators might encounter more difficulty in establishing the needed information.[8]

Certainly, any procedure calling for an oral hearing or providing for confrontation and cross-examination would increase the administrative and fiscal burdens on the Commission. Unfortunately, due to the undeveloped state of the record, we are unable to determine to what extent the Government's burden would increase in this regard.

A balance must be struck that will accommodate the various competing interests. We reiterate the wise admonishment of Mr. Justice Frankfurter that differences in the origin and function of administrative agencies "preclude wholesale transplantation of the rules of procedure, trial, and review which have evolved from the history and experience of courts." *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 143 [60 S.Ct. 437, 441, 84 L.Ed. 656] (1940). The judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances. The essence of due process is the requirement that "a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it." *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S., at 171–172 [71 S.Ct., at 649, 95 L.Ed. 817] (Frankfurter, J., concurring). All that is necessary is that the procedures be tailored, in light of the decision to be made, to "the capacities and circumstances of those who are to be heard" *Goldberg v.*

*Kelly*, 397 U.S., at 268–269 [90 S.Ct., at 1021, 25 L.Ed.2d 287] (footnote omitted), to insure that they are given a meaningful opportunity to present their case. *Mathews v. Eldridge*, 424 U.S. 319, 348–49, 96 S.Ct. 893, 909, 47 L.Ed.2d 478 (1976).

"It is an opportunity which must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). It remains the job of the courts "to give content to that general principle . . . by balancing the Government's asserted interests against those of the [individual]." *Arnett v. Kennedy*, 416 U.S. 134, 212, 94 S.Ct. 1633, 1673, 40 L.Ed.2d 15 (1974) (Marshall, J., dissenting). In reaching the ultimate balance leading to a determination of what process is due, it is helpful to examine the procedural safeguards called for in similar circumstances involving protected rights.

At one end of the spectrum is *Goldberg* which dealt with an attempted termination of welfare benefits. The Court, holding that a pre-termination evidentiary hearing was required, emphasized that "the crucial factor in this context—a factor not present in the case of the blacklisted government contractor, the discharged government employee, the taxpayer denied a tax exemption, or virtually anyone else whose governmental entitlements are ended—is that termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits." At 264, 90

**8.** We do not now express an opinion on whether in the context of government employment the Due Process Clause prohibits, even in the fact of a showing of good cause, the nondisclosure of the Commission's sources. One aspect of this question which was neither briefed nor argued before this Court touches on the scope of the Privacy Act of 1974, 5 U.S.C. §§ 552a *et seq.* In the district court, the Commission argued that its refusal to reveal the sources used in the investigation was justified by 5 U.S.C. § 552a(k)(5). This section provides an exception to the Act's general requirement that government agencies permit an individual access to the agency's records containing information about him. 5 C.F.R. § 736.103 provides

that the investigator must notify everyone interviewed that all information provided, including the source's identity, may be disclosed to the individual upon his request. "The agent may promise confidentiality if requested by the source, and in his discretion notify the source that he may have confidentiality where the agent feels that such notification is necessary to secure information." Additionally, pledges of confidentiality may not be assumed. Implicit in such a regulation is the required finding of good cause as a necessary prerequisite for the granting of confidentiality. *Cf. McNeill v. Butz*, 480 F.2d 314, 323 (4th Cir. 1973). No such finding was made by the district court.

S.Ct. at 1018. (Emphasis in original). Finding, *inter alia*, that "[w]ritten submissions are an unrealistic option for most recipients, who lack the educational attainment necessary to write effectively and who cannot obtain professional assistance," (at 269, 90 S.Ct. at 1021) the Court held that in order to minimize the risk of error, such recipients were entitled to an oral hearing including the right to confront and cross-examine witnesses.

The other end of the spectrum is represented by cases that recognize the importance of the individual's interest, yet do not afford the full range of procedural due process protections to the individual when balanced with the Government's asserted interest. Illustrative of such cases is *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), where public school students were held deprived of due process when they were suspended from school for up to ten days without a hearing. In this context, the "rudimentary precautions against unfair or mistaken findings" (at 581, 95 S.Ct. at 740) required by the Due Process Clause consist of oral or written notice of the charges, and if denied, an explanation of the adverse evidence and a chance to explain.

> We stop short of construing the Due Process Clause to require, countrywide, that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident. *Id.* at 583, 95 S.Ct. at 740.

One of the court's concerns was that "[i]f sustained and recorded, those charges could seriously damage the students' . . . later opportunities for higher education and employment." *Id.* at 575, 95 S.Ct. at 736.[9] While the employment loss to the students is speculative, the loss suffered by applicants such as Larry is a present and tangible loss. Hence, the infringement on liberty involved in due process claims such as Larry's is a more serious deprivation than that given recognition by the court as owing to the suspended students.

In reaching the balance, we note that various alternative procedures are available. The range includes a full hearing complete with confrontation and cross-examination; supplying a list of the sources, in addition to their statements; a very detailed summary giving dates and places yet short of revealing names; and, lastly, the summary recapitulation supplied to the appellant here.

■ In effect the Commission struck the balance in favor of making only the summary available. The Commission's requirement that Larry make his response to a challenge of his constitutional liberty interest in writing smacks of administrative tyranny. The suggestion of tyranny may only be alleviated by a discerning judicial evaluation of the governmental interest; that is, the fiscal and administrative burdens that additional or substitute procedural requirements would entail. We assume, *arguendo*, that the Commission has thousands of applicants for governmental jobs per year, for which the Commission has the statutory command to screen and reach a determination of suitability. Yet we also assume that the Government has a need for thousands of qualified individuals for governmental positions per year. The Commission's chore is to avoid denying applicants constitutional due process while supplying a qualified labor force to fill the Government's needs without excessive administrative burden and fiscal outlay.

As stated above, the Commission's requirement of allowing only written response to adverse information which may trigger a three year debarment may well amount to a denial of due process. The administrative as well as the district court's

---

9. Another recent situation in which the Supreme Court has held that the process due a protected liberty interest did not necessarily include confrontation and cross-examination can be found in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 295 (1974). At issue was the procedure followed in prison disciplinary hearings, the determination of which affected the prisoner's release date.

factual records are silent as to what fiscal and administrative burdens the Government would face if the Commission were required to provide alternative procedures before determining suitability for governmental employment.

We believe it incumbent upon the Commission to factually meet the third factor by determining through regulation or policy its concept of the additional procedural protections, if any, which can be granted without excessive administrative burdens and fiscal outlays. Such administrative concept can then be judicially tested upon an adequate record.

So far as Larry is concerned, the three year debarment has now served its avowed purpose and he is free to reapply. Yet reality is a hard master and the standing administrative conclusion of Larry's unfitness is an automatic call of two strikes against him before he even picks up his bag of bats.

"Our legitimate role in a case such as this is necessarily a limited one . . . . 'The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by [the government].' *Bishop v. Wood, supra*, 426 U.S. [341] at 349 [, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684] . . . . Nevertheless, those decisions must be reached consistent with . . . the salutary proscriptions of our Constitution." *Mazaleski*, 183 U.S. App.D.C. at 203, 562 F.2d at 722. To assure such compliance and in the interests of conservation of administrative and judicial time and expense, the summary judgment should be vacated and the cause remanded to the Commission for further proceedings.

■ Accordingly, the summary judgment entered by the district court is vacated and the cause is remanded to the district court for immediate remand to the Commission for expungement of the record of Maurice M. Larry.

JUDGMENT VACATED AND CAUSE REMANDED.

HARLINGTON WOOD, Jr., Circuit Judge, dissenting.

Though the majority opinion has fairly considered the issues, I must respectfully dissent. In my judgment, there was no failure of due process afforded plaintiff as a job applicant.

Plaintiff was specifically advised by the Commission in writing and given the opportunity to respond to certain adverse information collected during the course of the investigation. That information concerned Larry's termination from Comprehensive Health Planning, Inc. because of excessive absenteeism; the termination (nonrenewal) of Larry's contract by the University of Illinois, Chicago Circle, because of substandard work and abusive treatment and threats to his colleagues and associates; the nature and frequency of Larry's rather extensive arrest/conviction record between August 1962 and May 1974; and information from neighbors, co-workers and supervisors indicating that Larry was a habitual and excessive user of intoxicants over the past five years. Footnote 6 of the majority opinion sets forth the full scope of the drunkenness allegation which was supplied in advance to Larry. It may be summed up, as therein stated, that he had the reputation of being a drunk.

Larry did not directly deny the drunkenness allegation, only claiming that he had since reformed. He admitted several arrests for drunkenness, and other arrests and convictions. He endeavored to explain the adverse information away, but without supporting affidavits from any former employer, co-worker, neighbor, or anyone else, although he submitted some unsworn statements by several former associates.

It was found by the Commission after considering its information and Larry's responses that his unsatisfactory employment record and habitual excessive use of intoxicating beverages disqualified him from federal employment under Civil Service Regulations. That finding was fairly arrived at and fully justified. The public is entitled to public servants without Larry's adequately demonstrated shortcomings.

Larry was given sufficient advance notice of the adverse information with sufficient opportunity to respond. His responses, apart from the apparent admission of excessive drinking, were evasive, merely self-serving or otherwise unconvincing. The individual sources of the Commission information were not specifically identified to Larry, but employers were named and other sources were identified by references as co-residents, co-workers and employment supervisors. Persons in those classes with personal knowledge of Larry's work and personal habits did not need to be individually identified. He could reasonably be expected to know who they or others in those classes were. He could have sought them out to refute the allegations if the allegations were refutable. As he did not deny the drunkenness allegations, the names of the parties supplying that information were in any event immaterial.

To require more of the government in considering its numerous job applicants, I believe, would impose an impractical and unnecessary burden. I would not disturb the Commission's exercise of its judgment and discretion, and would affirm.