Loraine POLLOCK, Appellant,

v.

BAXTER MANOR NURSING HOME, Appellee.

No. 82-1584.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 14, 1983.

Decided April 27, 1983.

Rehearing and Rehearing En Banc Denied Sept. 13, 1983.

McMillian, Circuit Judge, filed dissenting opinion.

John L. Burnett, Lavey & Harmon, Little Rock, Ark., for appellant.

G. Ross Smith, P.A., Little Rock, Ark., for appellee.

Before ROSS, Circuit Judge, HENLEY, Senior Circuit Judge, and McMILLIAN, Circuit Judge.

PER CURIAM.

Loraine Pollock instituted this action against Baxter Manor Nursing Home alleging that the nursing home deprived her of procedural due process of law by discharging her from employment under stigmatizing conditions without according her prior notice or a hearing. The nursing home denied that any constitutionally protected "liberty" interest was implicated in Pollock's termination and also alleged, in the alternative, that if a "liberty" interest was involved, Pollock was afforded the protections guaranteed by the fourteenth amendment.

The district court, the Honorable H. Franklin Waters, found that Pollock was not entitled to judgment and accordingly dismissed her complaint.

We have carefully studied the record, including the district court's opinion, the briefs and the arguments of the parties to this action. We find no merit to appellant's arguments and accordingly affirm solely on the basis of Judge Waters' third conclusion of law, which stated:

3. Before a "liberty" interest is implicated, in employee-discharge cases however, there must be publication of the reasons for termination, the publication must occur at the hands of the governmental employer, the charges must be defamatory, and the charges must be false. *Buhr v. Buffalo Public School Dist.*, 509 F.2d 1196 (8th Cir.1974); *Cato v. Collins*, 539 F.2d 656 (8th Cir.1976); *Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977); *Seal v. Pryor*, 670 F.2d 96 (8th Cir.1982).

*Pollock v. Baxter Manor Nursing Home,* 536 F.Supp. 673, 680 (W.D.Ark.1982). We agree that under the facts of this case, Pollock could not prevail because a liberty interest does not arise unless an employer disseminates a *false* and defamatory statement. The district court specifically found that the nursing home's statements to Pollock's prospective employer were true and we do not believe that such a finding was error. Thus, Pollock suffered no infringement of any liberty interest by the nursing home. The judgment of the district court is affirmed.

McMILLIAN, Circuit Judge, dissenting.

I respectfully dissent.

The facts of this case are relatively simple. Pollock once worked for a county-owned nursing home. She was fired by the home for allegedly clocking her daughter's time card in and out when her daughter had not reported for work that day. Pollock received an exit interview when she was fired. Subsequently Pollock and her counsel met with the home's counsel to discuss a possible out-of-court settlement of Pollock's claim that she was falsely accused and should be reinstated. The home's counsel refused to recommend to the home's Board of Governors that she be reinstated. The Board affirmed her dismissal. About a year later Pollock applied for a position at a privately-owned nursing home.

In the process of applying for the new position, she signed an authorization for her former employers to release information about her prior job performance. The privately-owned nursing home presented the authorization form to the county-owned nursing home. The county-owned nursing home then provided the information that Pollock had been "terminated for clocking her daughters in and out on time clock when they weren't working." Pollock then sued the county-owned home for depriving her of liberty without due process of law. The district court found Pollock had indeed clocked her daughter's time card fraudulently. The court concluded that because the allegations against Pollock were true, she was not deprived of her liberty interest in her reputation. This appeal ensued.

The majority's opinion holds that before a discharged public employee is entitled to a hearing to refute stigmatizing information published in conjunction with her discharge, she must first successfully refute the stigmatizing information. I cannot agree.

I. *The Role of Due Process*

The fundamental purpose of procedural due process is to ensure fairness in the manner in which government exercises its power. *See Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 161, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). First, by requiring the government to give an individual an opportunity to be heard before being deprived of life, liberty, or property, due process promotes the form or appearance of justice. Its salutary effect is to establish the ideal that society is ruled by law and not by the caprice of the men and women in power. It also reinforces respect for the inherent dignity and worth of the individual. Secondly, due process protects against error based upon inaccurate or incomplete information by requiring the government to comport with regularized procedures that are subject to judicial review. *See Saphire, Specifying Due Process Values: Toward a*

*More Responsive Approach to Procedural Protection,* 127 U.Pa.L.Rev. 111, 119–21 (1978). In short, procedural due process is meant to keep the government objective and honest in its dealings with individuals.

Requiring a discharged public employee to prove that the stigmatizing information is false before a right to a hearing is established will provide a great disincentive for the government to conduct *any* termination hearings. The practical difficulties a public employee encounters in haling the government into court and bearing the burden of proving the falsity of the government's charges may be overwhelming. If a governmental entity, or its agents, are to be liable only when the discharged public employee surmounts these barriers, the governmental entity is likely to take the position: "Well, if you think I am wrong, sue me and prove it." Thus, instead of holding a hearing whenever the government stigmatizes an employee in the course of terminating his or her employment, the government would only have to conduct a hearing when the injured employee takes the substantial initiative of suing the government. This would be an anathema to the whole ideal of fair play embodied in the due process clauses. The absence of fair pre-termination hearings when important liberty interests are at stake also destroys the appearance of justice and increases the risk of error. As the Tenth Circuit recently noted in holding that a stigmatized public employee need not prove falsity to establish a right to a due process hearing: "Just as we provide criminal trials to the guilty as well as to the innocent, we provide opportunities to rebut serious charges to those who will fail as well as to those who will prevail." *McGhee v. Draper,* 639 F.2d 639, 643 (10th Cir.1981).

## II. *Falsity and the Caselaw*

The district court's decision below relied principally upon the Supreme Court's holding in, and several lower courts' interpretation of, *Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam). I believe that the district court and the majority have misread the holding of *Codd.* I read *Codd* as holding that a publicly stigmatized employee who has been dismissed need only allege falsity or deny the substantial truth of the historical facts underlying the stigmatizing information in order to establish a right to a hearing.

To understand the *Codd* decision, one must first understand that there is a marked difference between proving a deprivation of a liberty interest and proving consequential damages caused by that deprivation. In *Carey v. Piphus,* 435 U.S. 247, 266–67, 98 S.Ct. 1042, 1053–57, 55 L.Ed.2d 252 (1978), the Supreme Court held that damages for deprivations of constitutional rights cannot be inferred. All damages, except nominal damages, must be proved separately from the fact that the deprivation has occurred. But, by the same token, *Carey* also stands for the proposition that a plaintiff may recover nominal damages for the constitutional deprivation in and of itself. In the context of a public employee discharge case, *Carey* requires a discharged public employee who is seeking reinstatement or backpay to prove that she would not have been discharged if she had been given a due process hearing. Ordinarily, this would require proving that the stigmatizing information is false. Yet, as Pollock points out in her brief, her failure of proof on the matter of consequential damages has nothing to do with establishing that her right to due process has been breached. The deprivation, and the nature of the damages that flow from the deprivation, must be considered as separate and distinct elements of a procedural due process cause of action. *See Bishop v. Tice,* 622 F.2d 349, 357–58 & n. 17 (8th Cir.1980).

In *Codd,* the plaintiff was a policeman for the Penn-Central Railroad who at one time had been a police officer trainee for the City of New York. Penn-Central dismissed the plaintiff when the City of New York released information to Penn-Central concerning an incident in which the plaintiff "had put a revolver to his head in an apparent suicide attempt." 429 U.S. at 626, 97

S.Ct. at 883.[1] The plaintiff never denied the truth of this information. After he was fired, the plaintiff sued New York City solely for backpay and damages rather than for a hearing. *Id.* at 625 & n. 1, 97 S.Ct. at 883 & n. 1. In assessing the merits of the plaintiff's claim for backpay and other consequential damages caused by the alleged denial of due process, the Supreme Court said:

> Assuming all of the other elements necessary to make out a claim of stigmatization under [*Board of Regents v.*] *Roth* [408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)] and *Bishop* [*v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976)], the remedy mandated by the Due Process Clause of the Fourteenth Amendment is "an opportunity to refute the charge." 408 U.S., at 573 [92 S.Ct. at 2707]. "The purpose of such notice and hearing is to provide the person an opportunity to clear his name," *id.,* at 573 n. 12 [92 S.Ct. at 2707 n. 12]. But if the hearing mandated by the Due Process Clause is to serve any useful purpose, *there must be some factual dispute* between an employer and a discharged employee which has some significant bearing on the employee's reputation. Nowhere in his pleadings or elsewhere has respondent affirmatively asserted that the report of the apparent suicide attempt was substantially false. Neither the District Court nor the Court of Appeals made any such finding. When we consider the nature of the interest sought to be protected, we believe the *absence of any such allegation* or finding is fatal to respondent's claim under the Due Process Clause that he should have been given a hearing.

429 U.S. at 627, 97 S.Ct. at 883 (emphasis added).

The Court then went on to hold that because the plaintiff had not raised an issue about the substantial accuracy of the stigmatizing information, he "made out no claim under the Fourteenth Amendment *that he was harmed by the denial of a hearing.*" *Id.* at 628, 97 S.Ct. at 884 (emphasis added).[2] But because the plaintiff

---

1. The information was released pursuant to an authorization signed by the plaintiff.

2. Before expressing its holding, the Supreme Court distinguished the right and remedies parolees enjoy in parole revocations from the right and remedies enjoyed by discharged public employees who have no property rights in their public employment. In the parole revocation situation the due process hearing serves two functions. The first is to vindicate the parolee's reputation by determining "whether the parolee in fact committed the violation with which he is charged." *Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 883, 51 L.Ed.2d 92 (1977) (per curiam). The second function is to determine whether the parolee's legal status should be altered (parole revoked) according to the guidelines that limit the decisionmaker's discretion under the law. "The fact that there was no dispute with respect to the commission of the act would not necessarily obviate the need for a hearing on the issue of whether the commission of the act warranted the revocation of parole." *Id.* at 627, 97 S.Ct. at 882.

The role of a due process hearing is quite different in situations where a stigmatized public employee is discharged from a job in which she has no property rights. In such situations, there are no bridles on the administrator's discretion that are susceptible to judicial review, for if there were any, the public employee would have a property interest in his employ-ment. *See Codd,* 429 U.S. at 628, 97 S.Ct. at 884; *Bishop v. Wood,* 426 U.S. 341, 347, 96 S.Ct. 2074, 2078, 48 L.Ed.2d 684 (1976). But without the property interest, the only function the due process hearing can serve is to vindicate the employee's reputation. *See Codd,* 429 U.S. at 627, 97 S.Ct. at 883; *Graves v. Duganne,* 581 F.2d 222, 224 (9th Cir.1978). If the employee "does not *challenge* the substantial truth of the material in question, no hearing would afford a promise of achieving that result for him." *Codd,* 429 U.S. at 627–28, 97 S.Ct. at 883–84 (emphasis added).

But if, on the other hand, the stigmatized public employee does challenge the truth of the stigmatizing information, a due process hearing does hold the promise of clearing the employee's name—just as a parolee's hearing holds out the promise that his parole will not be revoked even if he did commit a violation. Before a parolee is entitled to a parole revocation hearing, we do not require the parolee to prove that the mitigating circumstances of his violation are so overwhelming that no rational decisionmaker would revoke his parole. Nor should we require a stigmatized public employee to clear his name before we allow him a name-clearing hearing. It should be "enough to invoke the procedural safeguards of the Fourteenth Amendment that a significant property [or liberty] interest is at stake, whatever the ultimate outcome of a hearing." *Carey v.*

only prayed for consequential damages and "did not seek a delayed *Roth* hearing," the Supreme Court expressly noted that it had "no occasion to consider the burden of pleading and proof of the necessary issues as between the federal forum and the administrative hearing where such relief is sought." *Id.* 429 U.S. at 625 n. 1, 97 S.Ct. at 883 n. 1. Thus, in the *Codd* per curiam opinion, the Supreme Court did not address or answer the question of what proof is required to establish a right to a due process hearing. The Court's subsequent decision in *Carey v. Piphus,* 435 U.S. at 266, 98 S.Ct. at 1053, however, did answer the question. There the Court ruled:

"It is enough to invoke the procedural safeguards of the Fourteenth Amendment that a significant property interest is at stake, whatever the ultimate outcome of a hearing ...." [3] .... Because the right to procedural due process is "absolute" in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury.

*Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978), *citing Fuentes v. Shevin,* 407 U.S. 67, 87, 92 S.Ct. 1983, 1997, 32 L.Ed.2d 556 (1972). *See McGhee v. Draper,* 639 F.2d 639, 643 (10th Cir.1981).

**3.** *Quoting Fuentes v. Shevin,* 407 U.S. 67, 87, 92 S.Ct. 1983, 1997, 32 L.Ed.2d 556 (1972).

**4.** *Carey v. Piphus* was decided in the context of a student's suspension from public school. Although student suspensions have been viewed as a deprivation of property, *Goss v. Lopez,* 419 U.S. 565, 574, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975), they have also been seen as implicating a liberty interest in the student's reputation. *Id.* at 574–75, 95 S.Ct. at 736. *See Paul v. Davis,* 424 U.S. 693, 710, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976). In either case, the *Carey* opinion is controlling in this case. *See supra* note 2 discussing due process in parole revocations.

**5.** With all due respect to the district court below, a majority of the Courts of Appeals has not held to the contrary. At least four Courts of Appeals follow the Fifth Circuit's rule that the discharged public employee need only allege falsity to trigger a right to a hearing. *See*

435 U.S. at 266, 98 S.Ct. at 1053 (citations omitted, footnote omitted).[4] The Court then remanded the case with instructions that even if the trier of fact determined that the suspensions were justified, the plaintiff was still entitled to nominal damages because he was not given a due process hearing.

The district court also relied upon *Seal v. Pryor,* 670 F.2d 96, 99 (8th Cir.1982), for the proposition that a discharged public employee must show that the stigmatizing information is false in order to prevail. But the *holding* in *Seal,* an opinion I authored for the court, is specifically premised upon the fact that the public employee did not deny the substantial truth of the charges that led to his dismissal. *Id.* at 99.

It is clear to me, therefore, that neither Supreme Court nor our own precedent requires a discharged public employee to prove the falsity of the government's stigmatizing charges before she can establish a liberty interest in her reputation. All a plaintiff need do is deny the substantial truth of the stigmatizing information released by the government in conjunction with a change in her legal status.[5]

*Love v. Sessions,* 568 F.2d 357, 360 n. 6 (5th Cir.1978) (per curiam). *Accord Painter v. FBI,* 694 F.2d 255, 256 (11th Cir.1982); *Vanelli v. Reynolds School Dist.,* 667 F.2d 773, 777–78 (9th Cir.1982); *McGhee v. Draper,* 639 F.2d 639, 643 (10th Cir.1981); *Kendall v. Board of Educ.,* 627 F.2d 1, 5 (6th Cir.1980). The law in the Fourth and First Circuits is less clear, but the analysis employed in those circuits' recent cases would support liability for nominal damages merely upon an allegation of falsity and a failure to give the plaintiff a due process hearing. *See Ledford v. Delancey,* 612 F.2d 883, 886–87 (4th Cir.1980); *Burt v. Abel,* 585 F.2d 613, 616 (4th Cir.1978); *Rodriguez de Quinonez v. Perez,* 596 F.2d 486, 491 & n. 5 (1st Cir. 1979).

The only two circuits, outside of the Eighth Circuit, that require proof of falsity, even for a claim for nominal damages, are the Second and Seventh Circuits. *See Smith v. Lehman,* 689 F.2d 342, 346 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 820, 74 L.Ed.2d 1018 (1983); *Colaizzi v. Walker,* 655 F.2d 828, 831–32 (7th Cir.1981). The *Colaizzi* case was relied upon heavily by the district court below. The cryptic *Colaizzi* holding, however, appears to

III. *Legal Status*

In *Paul v. Davis,* the Supreme Court held that the deprivation of a person's interest in her reputation alone is insufficient "to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment." 424 U.S. at 711, 96 S.Ct. at 1165. A stigmatized public employee must show something more—she must show that some "right or status previously recognized by state law was distinctly altered or extinguished." *Id.* The Fifth Circuit has characterized this requirement as "stigma-plus." *Dennis v. S & S Consolidated Rural High School District,* 577 F.2d 338, 341 (5th Cir.1978). In my opinion, Pollock has demonstrated that "plus" because the stigma arose in conjunction with her termination from government employment.

The *Paul v. Davis* concept of legal status is rather ethereal. The parameters of the concept were developed by the *Paul v. Davis* majority in its re-synthesis of prior Supreme Court precedent. *See* 424 U.S. at 701–11, 96 S.Ct. at 1160–65. These precedents had been thought to hold that a person's interest in his or her reputation was a protectable liberty interest. But the *Paul v. Davis* majority found in each case some legal status that was effected by the government imposed stigma, such as the right to purchase alcohol, permanent foreclosure from all future government employment, loss of tax exemptions, revocation of a driver's license, termination from government employment, and suspension from public school. *Id.* From these examples of legal status the First Circuit concluded that "when a state holds out a right to citizens to engage in an activity on equal terms with others, a state recognized status exists." *Medina v. Rudman,* 545 F.2d 244, 250 (1st Cir.1976).

Pollock alleges that she was denied employment with a private nursing home because of the stigmatizing information released by the county-owned nursing home. Beyond a tort law action for damages, Ar-

kansas law does not protect Pollock's right to private employment. Thus, no alteration of a previously recognized right, as envisioned by *Paul v. Davis,* has occurred because the private nursing home refused to hire her. *See Paul v. Davis,* 424 U.S. at 711–12, 96 S.Ct. at 1165. Of course in certain situations the nature of the information released by the government about a former employee, and the manner in which it is released, will work a de facto revocation of the former employee's right to engage in his or her chosen profession. *See, e.g., United States v. Lovett,* 328 U.S. 303, 314, 316, 66 S.Ct. 1073, 1078, 1079, 90 L.Ed. 1252 (1946); *Mervin v. FTC,* 591 F.2d 821, 828 (D.C.Cir.1978); *Christhilf v. Annapolis Emergency Hospital Ass'n,* 496 F.2d 174, 178 (4th Cir.1974); *Adams v. Walker,* 492 F.2d 1003, 1008–09 (7th Cir.1974). In such situations the former employee should be afforded due process protection. The record in this case, however, does not show a deprivation of this magnitude. The government released the stigmatizing information to only one potential employer and did so at Pollock's request. Thus, the only change in Pollock's legal status disclosed by the record is Pollock's termination from government employment. *See Paul v. Davis,* 424 U.S. at 702–06, 709–10, 96 S.Ct. at 1161–63, 1164–65. The question in this case then is whether the stigmatizing information was published in conjunction with that change of legal status. *See Dennis v. S & S Consolidated Rural High School District,* 577 F.2d at 341; *Drummond v. Fulton City Department of Family & Children Services,* 563 F.2d 1200, 1207–08 (9th Cir.1977).

This court has stated on several occasions that when stigmatizing reasons for the employee's discharge are incorporated into a record which is made available to prospective employers, or is actually disclosed to prospective employers, the stigmatized former employee is entitled to notice and a hearing. *See Clark v. Mann,* 562 F.2d 1104, 1116 (8th Cir.1977); *Churchwell v. United*

be at odds with earlier Seventh Circuit precedent. *See Larry v. Lawler,* 605 F.2d 954, 960 n. 7 (7th Cir.1978); *Austin v. Board of Educ.,* 562

F.2d 446, 448–51 (7th Cir.1977) (discussing *Codd* at length).

*States,* 545 F.2d 59, 62 (8th Cir.1976); *Greenhill v. Bailey,* 519 F.2d 5, 8 (8th Cir. 1975); *Buhr v. Buffalo Public School District No. 38,* 509 F.2d 1196, 1199 (8th Cir. 1974).[6] Our holding in *Churchwell v. United States* is equally applicable to this case.

The circumstances surrounding Churchwell's dismissal present this court with a case of *actual* disclosure of stigmatizing information. Churchwell, a registered nurse, was charged with misusing drugs on patients and possibly with lying to cover up her own drug misuse. The affidavit of one prospective employer indicates that "but for the information obtained from her previous employer * * to the effect that she had been terminated as a registered nurse for alleged 'drug errors' while on duty" he would have hired Churchwell. There can be no question that the effect of disclosing such allegations has stigmatized and jeopardized Churchwell's continued employment in the medical profession. As noted in the district court opinion, this is precisely the stigma which *Roth* held to be intolerable without a hearing.

545 F.2d at 62–63.

The fact that Pollock authorized the release of the information by signing a mandatory application form does not require a different result. As a practical matter, a job applicant has no choice but to sign the application's authorization form. In contracts of adhesion, the non-drafting party is held not to have voluntarily consented to be bound by all of the contract's terms. Likewise, Pollock should not be held to have voluntarily aired the stigmatizing information in her file simply because she signed the required authorization form. *See Velger v. Cawley,* 525 F.2d 334, 336 (2d Cir.

1975), *rev'd on other grounds sub nom. Codd v. Velger,* 429 U.S. 624, 96 S.Ct. 3188, 49 L.Ed.2d 1197 (1977) (per curiam). The county-owned nursing home could have responded to the request for information by stating Pollock had been terminated, without indicating the stigmatizing reasons for her dismissal. Or it could have provided Pollock with a due process hearing before releasing the stigmatizing information. For at the time the county-owned nursing home released the information, it *could not know* whether or not the charges were "true" unless it had made that determination after a due process hearing in which Pollock received prior notice and an opportunity to be heard. A determination of the truth of the charges made by a trier of fact after the publication of the stigma cannot be used *post hoc* to justify the county's actions. *See Love v. Sessions,* 568 F.2d 357, 360 n. 6 (5th Cir.1978). Due process requires the government to base decisions that may deprive an individual of important liberty interests upon information from both sides of the controversy, not just upon the government's conception of the truth.[7] "Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of the rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and an opportunity to meet it." *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 171–72, 71 S.Ct. 624, 648–49, 95 L.Ed. 817 (Frankfurter, J., concurring). Under these circumstances, responsibility for the dissemination of the stigmatizing information should not be shifted to the former employee. I would therefore follow our previous decision in *Churchwell v. Unit-*

---

6. *Accord Vanelli v. Reynolds School Dist. No. 7,* 667 F.2d 773, 776–78 (9th Cir.1982); *Swilley v. Alexander,* 629 F.2d 1018, 1022 (5th Cir. 1980); *Ventetuolo v. Burke,* 596 F.2d 476, 483–84 (1st Cir.1979); *Mazaleski v. Treusdell,* 562 F.2d 701, 712–14 (D.C.Cir.1977). *Cf. Ampleman v. Schlesinger,* 534 F.2d 825, 828 (8th Cir.1976) (mere placement of stigmatizing information in a file that is kept confidential by Air Force regulations does not deprive discharged serviceman of his liberty).

7. This is not to say that the government may not take prompt action in emergency situations. The Supreme Court has stated that under certain circumstances a post-deprivation hearing may be all that is required. *See Goss v. Lopez,* 419 U.S. 565, 582–83, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975).

ed States and hold that Pollock has been deprived of liberty.[8]

## IV. *The Process That Is Due*

In May of 1980, Pollock, her attorney and her two daughters were present at a meeting held at the office of the county-owned nursing home's attorney. Members of the county-owned nursing home's Executive Committee, the home's administrator, and several of the home's witnesses were present as well. The meeting was called as a settlement conference, however, and Pollock's attorney expressly stated at the outset that the meeting was not to be considered as the due process hearing Pollock never received. The home's attorney responded that he "understood." Pollock's attorney also stated he had several witnesses who would support Pollock's version of the facts and that he would present these witnesses at a hearing if the home's Board of Governors would provide Pollock with one. These witnesses were not present at the settlement conference. Relevant documentary evidence also was not available at the conference.

The process that is due a person deprived of liberty depends upon an "appropriate accommodation of the competing interests involved," including: (1) the importance of the private interest, (2) the length or finality of the deprivation, (3) the likelihood of government error as well as the probable value, if any, of additional procedural safeguards, and (4) the magnitude of the governmental interest involved. *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 434–35, 102 S.Ct. 1148, 1157–58, 71 L.Ed.2d 265

(1981), *quoting Goss v. Lopez,* 419 U.S. at 579, 95 S.Ct. at 738. At minimum, "the Due Process Clause grants the aggrieved party the opportunity to present his case and have its merits fairly judged." *Logan,* 455 U.S. at 433, 102 S.Ct. at 1156.

In employment termination cases, such as this one, where stigmatizing information is the basis for the termination, witness credibility is decisive. The decisionmaker cannot fairly judge the merits of the case unless the former employee is given a chance to present his own witnesses and to cross-examine the employer's witnesses. *See* Toman, *Practical Guidelines for Liberty Interest Hearings in Public Employee Dismissals,* 14 Urb.Law. 325, 349 (1982). Presentation and cross-examination of witnesses by Pollock, therefore, would have provided a significant additional procedural safeguard. Pollock's interest in her reputation and continued employment is great, especially because her termination is final and permanent. Conversely, the county home's interest in maintaining a competent and honest work force is also considerable. On balance, however, I conclude that Pollock was not afforded due process by the May, 1980 settlement conference for three reasons. First, all parties to the meeting "understood" that this was not to be Pollock's name-clearing hearing. The home's attorney repeatedly stated that his purpose at the meeting was to show Pollock what his evidence would be at any hearing *Pollock* chose to instigate in court. He also stated his advice to the Board of Governors would be that the home not give Pollock any hearing. Second, Pollock was not given a mean-

---

**8.** *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) and *Cato v. Collins,* 539 F.2d 656 (8th Cir.1976), are not to the contrary. In *Bishop v. Wood,* the stigmatizing charges were first publicly aired when the discharged employee sued the chief of police for violating his due process rights. In *Cato v. Collins,* the charges were aired when the discharged employee demanded and received a public hearing on the merits of her termination. The Supreme Court in *Bishop v. Wood* held that the publication of the stigma during the course of litigation could not form the basis for an allegation of a due process violation because it would penalize "forthright and truthful communica-

tion ... between litigants." 426 U.S. at 349, 96 S.Ct. at 2079. No similar consideration is present when a former employer releases information to a prospective employer. *See also Clark v. Mann,* 562 F.2d 1104, 1116 (8th Cir. 1977) (stressing that where derogatory reasons for termination are *not* incorporated into a record made available to a prospective employer, but rather are *solely* publicized by way of a public hearing held at the behest of the discharged employee, no due process violation has occurred). *Cf. Cato v. Collins,* 539 F.2d at 660 (public disclosure at a public hearing requested by the plaintiff is not a basis for a liberty deprivation).

**244**

ingful chance to present or cross-examine witnesses or to present evidence, including the actual time card she was accused of altering. Pollock's position in the controversy was that she did not fraudulently alter her daughter's time card, but was only making legitimate overtime entries on other time cards. She stated that an inspection of those other time cards, along with the testimony of the employees to whom the time cards belonged, would verify her account. Also, a key alibi witness was not present. There was no opportunity to measure the credibility and reliability of Pollock's witnesses against the credibility and reliability of the home's witnesses. In addition, the reason Pollock did not present her witnesses or evidence was that she had no notice that the settlement conference was to be her opportunity to be heard on the merits before a decisionmaker. Third, in order to have the merits of one's case judged fairly, there must be some type of judge or decisionmaker. There was no decisionmaker present at the conference to weigh the evidence and the witnesses' credibility or to issue a determination on the merits. Although some members of the home's Executive Committee were present, the home's attorney actually controlled the meeting. When Pollock's attorney asked the home's attorney whether the home would either give Pollock a hearing or reinstate her with backpay, the home's attorney responded that he *could not* make any such decision for the Board. He could only advise the Board of Governors, and his advice would be that they do nothing and leave Pollock to her recourse in the courts.

Accordingly, and with all due deference to the majority and the district court below, I must dissent. I would award Pollock nominal damages of one dollar and reasonable attorney's fees to provide an incentive for the government to give due process hearings when they are due.