**Rixson Merle PERRY, Plaintiff-Appellant,**

v.

**FEDERAL BUREAU OF INVESTIGATION, et al., Defendants-Appellees.**

**No. 82–1136.**

United States Court of Appeals, Seventh Circuit.

Submitted Feb. 14, 1985.[*]

Decided April 11, 1985.

---

[*] After preliminary examination of the briefs, the Court notified the parties that it had tentatively concluded that oral argument would not be helpful to the Court in this case. The notice

Harlington Wood, Jr., Circuit Judge, dissented in part and filed opinion.

provided that any party might file a "Statement as to Need of Oral Argument." *See* Rule 34(a), Fed.R.App.P.; Circuit Rule 14(f). Plaintiff-appellant has filed such a statement and requested oral argument. Upon consideration of that statement, the briefs, and the record, the request for oral argument is denied and the appeal is submitted on the briefs and record.

Rixson Merle Perry, pro se.

Gail C. Ginsberg, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for defendants-appellees.

Before CUMMINGS, Chief Judge, and WOOD and CUDAHY, Circuit Judges.

CUMMINGS, Chief Judge.

This case—involving an unsuccessful applicant for a series of jobs with the federal government—raises issues concerning the Fifth Amendment's Due Process Clause and the Privacy Act, codified in part at 5 U.S.C. § 552a. The district court ruled that dissemination of an allegedly false FBI report about plaintiff to his prospective federal agency employers did not violate plaintiff's legal rights and granted summary judgment to defendants in a series of opinions. We affirm in part and reverse in part.

## I.

In 1976 Rixson Perry applied for a job as enforcement agent with the Bureau of Alcohol, Tobacco and Firearms ("BATF"). The BATF informed Perry that he was being considered for an appointment, and Perry signed a form authorizing the agency to obtain background information on him; the only part of the release pertinent to this appeal is that Perry authorized the release of information contained in "police and criminal records." In May 1976, the FBI sent the BATF, at the latter's request, a five-page report on plaintiff which contained allegations of third parties that Perry had impersonated state and federal law enforcement officers on numerous occasions.[1] The report contained allegations

---

1. The identities of the third parties were withheld from Perry when he finally obtained a copy of the report; it is not clear from the record if the names were expurgated from the report sent to the BATF. The FBI gathered this information in connection with earlier criminal

that Perry (1) had posed on various occasions as an FBI agent, a United States Marshal, and an Illinois State Trooper; (2) had illegally stopped cars, using a red emergency light and a siren; (3) carried numerous weapons in the trunk of his car; and (4) possessed various badges and other forms of police identification.[2] A cover letter that accompanied the report stated that the report "clearly reflects Perry's unstable nature." The record does not disclose whether this cover letter was sent to the BATF along with the report.

In June the BATF withdrew the tentative offer of employment it made Perry in April. Plaintiff alleges that in 1976, 1977 and 1978 he also did not receive law enforcement jobs with three other federal agencies—the U.S. Marshals Service, the Department of Agriculture, and the Internal Revenue Service (all defendants)—because of the FBI report. In particular, the complaint alleges that Perry was denied a position with the Marshals Service solely on the basis of information received orally from the FBI, the same information that was later compiled in the FBI report. (The district court's opinion of January 15, 1981, fixes the date of the decision not to hire Perry as April 22, 1976, three weeks before the date of the FBI report.) Moreover, Perry alleged that after being told by an official with the Department of Agriculture that he was an excellent candidate for a position with that agency, he was not hired because of the FBI report (allegedly transmitted to the Agriculture Department by the BATF). Finally, the record contains a copy of a 1977 letter from the IRS appointing plaintiff as a criminal investigator, subject to an investigation of Perry. Three weeks later, plaintiff alleges, the job offer

was withdrawn, based in part on the FBI report, which the IRS had received from the BATF.

Plaintiff contends that the FBI report is false and that its dissemination and use by the defendant agencies violated rights guaranteed him by the Constitution and the Privacy Act. For purposes of reviewing the grant of summary judgment to defendants, we must assume that the report is indeed false. *Munson v. Friske*, 754 F.2d 683 at 690 (7th Cir.1985). Some of the claims presented below have dropped out. Three issues remain on appeal: (1) whether the FBI violated section (e)(5) of the Privacy Act, 5 U.S.C. § 552a(e)(5), in compiling and distributing the report; (2) whether the FBI's disclosure of the report to the BATF violated 5 U.S.C. § 552a(b); and (3) whether the dissemination of the report implicated a liberty interest protected by the Due Process Clause. The district court ruled against Perry on all three issues. We agree with the district court's decision on the Privacy Act questions, but reverse with respect to plaintiff's due process claim.

## II.

■ Section (e)(5) of the Privacy Act requires each federal agency that maintains a system of records to "maintain all records which are used by the agency in making any *determination* about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the *determination*." 5 U.S.C. § 552a(e)(5) (emphasis supplied). Perry argues that this section requires the FBI to ensure that its records are accurate before sending them to other agencies. We disagree. Al-

---

investigations of plaintiff. The evidence was presented twice to the U.S. Attorney's office, but Perry was never prosecuted. Plaintiff, who worked for the FBI for several months in 1968 as a clerk, apparently believes that the FBI's actions are retaliation for plaintiff's breach of a one-year employment agreement with the FBI and his subsequent criticism of the agency.

**2.** It is true, as the dissent points out, that the first part of 18 U.S.C. § 912 makes it a crime to impersonate a federal officer or employee only

if one "acts as such." The FBI report, however, includes an allegation that Perry had served a subpoena in connection with a federal investigation. In addition, it is unclear from reading the expurgated version of the report whether Perry was posing as a federal or state law enforcement official when he allegedly stopped cars illegally. If he was allegedly posing as a U.S. Marshal, this conduct could violate 18 U.S.C. §§ 912 and 913.

though we have found two cases in which section (e)(5) has been applied to an agency whose records were used by another agency in making a determination about an individual,[3] these decisions are inconsistent with the statute's language and the legislative history.

■ To begin with, section (e)(5) applies only to records used by an agency in "making any *determination*" about an individual. The legislative history indicates that the word "determination" in section (e)(5) "means any *decision affecting* the individual which is in whole or in part based on information contained in the record and which is made by any person or any agency." H.R.Rep. No. 1416, 93d Cong., 2d Sess. 15 (1974) (emphasis supplied).[4] The FBI made no decision or determination about Perry. It merely sent a report, summarizing information provided by third parties, to the BATF, which would then decide whether to hire plaintiff. *Cf. Zeller v. United States*, 467 F.Supp. 487, 502 (E.D. N.Y.1979) (press release issued by agency

was not used by agency in making decisions adversely affecting plaintiff).

■ In addition, the statute requires agencies disseminating its records to anyone *other than an agency* to make reasonable efforts to ensure the records' accuracy and completeness. 5 U.S.C. § 552a(e)(6) (emphasis supplied).[5] The specific exclusion of agencies from section (e)(6) and the lack of provisions elsewhere in the Privacy Act on agency-to-agency transfers of records indicate that Congress did not intend the obligations of section (e)(6) to apply to the sending agency when records are sent from one agency to another.

In light of the statute's language, structure and legislative history, we interpret section (e)(5) to mean that when one federal agency sends records to another agency to be used by the latter in making a decision about someone, the responsibility for ensuring that the information is accurate, relevant, timely and complete lies with the receiving agency—the agency making the "determination" about the person in question—not the sending agency.[6] Guidelines

3. *See Doe v. United States Civil Service Comm'n*, 483 F.Supp. 539, 556 (S.D.N.Y.1980) (since defendant served as the "investigatory arm" of the White House Fellowship Commission it "should be subject to the same record keeping standards as an agency that makes its own personnel determinations"); *R.R. v. Dept. of the Army*, 482 F.Supp. 770, 773 (D.D.C.1980) (allegations that Army's refusal to correct its medical records caused Veterans Administration to deny plaintiff full benefits).

4. Although the bill that passed Congress and became the Privacy Act of 1974, Pub.L. No. 93–579, 88 Stat. 1897, was labeled as the Senate bill (S.3418), the statute's substance is principally that of the House bill (H.R. 16373). *Doe v. General Services Administration*, 544 F.Supp. 530, 533 (D.Md.1982); *Florida Medical Association, Inc. v. Dept. of Health, Education & Welfare*, 479 F.Supp. 1291, 1305–1306 (M.D.Fla. 1979). "The Privacy Act is essentially a House carcass under a Senate hide." *Florida Medical Association*, 479 F.Supp. at 1305. As a result, the House Report, rather than the Senate Report, is often the best barometer of Congressional intent. *Id.* at 1306. In any event, the Senate Report is consistent with the House Report on the meaning of "determination":

The standards of accuracy, completeness, and timeliness, as well as relevancy are directed to the quality of the information in an individu-

al's own file. The section thus looks to a double-pronged consideration, first to the authorized needs of the agency, and second, to the scope of the administrative need for information *in order to make a decision on that individual.*

S.Rep. No. 1183, 93d Cong., 2d Sess. 50 (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 6916, 6965 (emphasis supplied).

5. Section (e)(6) provides that agencies shall prior to disseminating any record about an individual to any person other than an agency, unless the dissemination is made pursuant to subsection (b)(2) of this section [Freedom of Information Act requests], make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes.

6. We also note that the beginning phrase of section (e)(5), "maintain all records," is broad enough to include information received from other agencies. "Record" is defined as "any item, collection, or grouping of information about an individual that is maintained by an agency." 5 U.S.C. § 552a(a)(4). And "maintaining" a record includes collecting it. 5 U.S.C. § 552a(a)(3).

drafted by the Office of Management and Budget ("OMB") shortly after the Privacy Act became law—guidelines still in effect today—are in accord with this interpretation. 40 Fed.Reg. 28,948, 28,964–28,965 (July 9, 1975) (Privacy Act Implementation: Guidelines and Responsibilities).[7] *See also Clarkson v. Internal Revenue Service,* 678 F.2d 1368, 1377 (11th Cir.1982); Note, *The Privacy Act of 1974: An Overview,* 1976 Duke L.J. 301, 315.

We recognize that our construction of section (e)(5)—compelled, we think, by the statutory language and its history—creates some practical problems for litigants. For example, after the FBI was granted summary judgment on Perry's section (e)(5) claim, Perry voluntarily dismissed his section (e)(5) claims against the remaining defendants because he felt they would provide little in the way of meaningful relief; the FBI would retain its report and the right to circulate it regardless of the outcome of the section (e)(5) claims against the other defendants. Appellant's Brief at 3. Besides the limited utility of a pyrrhic victory against the other agencies, it might be difficult for a plaintiff to win a section (e)(5) suit against a receiving agency. Section (e)(5), after all, requires only that an agency act reasonably in ensuring that the information it relies on in making employment decisions is accurate. It might be hard to argue, for example, that it is unreasonable for an agency to rely on a report from the nation's leading crime-fighting agency, especially when the FBI itself is in the best position to validate the information. But Congress was entitled to draft the Privacy Act this way, and any resolution of these problems must come from Capitol Hill, not the courts.

### III.

■ The Privacy Act prohibits the release of information about a person, with exceptions not relevant to this case, unless the individual consents to the disclosure in writing. 5 U.S.C. § 552a(b). Perry's second statutory claim is that he did not consent to the release of the FBI report. He contends that the reference to "police and criminal records" in the release he signed is limited to records of arrests and convictions. The phrase "police and criminal records," however, is broader in scope than arrest and conviction records. Information retrieved, as here, from the FBI's criminal investigative files fits comfortably within the category of criminal records. Although not as detailed as the waiver signed by the plaintiff in *Thomas v. Veterans Administration,* 467 F.Supp. 458, 460 n. 4 (D.Conn.1979), the release Perry signed is not so vague or general that it is questionable whether he knew what he was authorizing or whether the FBI knew what documents it could lawfully release to the BATF. *Cf., e.g.,* the boilerplate release in *Doe v. General Service Administration,* 544 F.Supp. 530, 531–532 (D.Md.1982). The release in this case is sufficient to comply with § 552a(b); Perry consented to the release of the information found in the FBI report.

### IV.

The most troublesome issue in this case is plaintiff's claim that the disclosure of the FBI report implicated a liberty interest protected by the Fifth Amendment. No constitutional claim would be stated if Perry alleged only that the FBI report defamed him, *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405, or if he claimed only that as a result of the report he did not receive a particular government job, *Cafeteria & Restaurant Workers, Local 473 v.*

---

7. The OMB's authority to promulgate guidelines for implementing the Privacy Act is found in § 6 of the Act, Pub.L. No. 93–579, 88 Stat. 1896, 1909 (1974). The guidelines were promulgated, contemporaneously with the Act's passage, by the OMB, the agency charged with overseeing implementation of the Act's requirements, and accordingly are entitled to deference in interpreting the statute's meaning. *Albright v. United States,* 631 F.2d 915, 919 n. 5 (D.C.Cir.1980); *Bartel v. Federal Aviation Administration,* 725 F.2d 1403, 1408 n. 9 (D.C.Cir.1984); *see generally United States v. Markgraf,* 736 F.2d 1179, 1183–1184 (7th Cir.1984), cert. dismissed, —— U.S. ——, 105 S.Ct. 1154, 84 L.Ed.2d 308.

*McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230. But Perry has alleged that the FBI is deliberately attempting to deny him employment within the federal government in a law enforcement position; the FBI, he claims, has willfully and intentionally made it impossible for him to get a federal law enforcement position and virtually impossible to obtain similar work with state or local government agencies. Plaintiff also claims that the allegations in the report are false, an essential element of his liberty interest claim. *Codd v. Velger,* 429 U.S. 624, 627–628, 97 S.Ct. 882, 883–884, 51 L.Ed.2d 92 (per curiam).

While most of the liberty interest cases involve individuals who have been dismissed, *e.g., Codd v. Velger; Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, *Munson v. Friske,* 754 F.2d 683 (7th Cir.1985), the plaintiff here was never hired. In *Larry v. Lawler,* 605 F.2d 954 (7th Cir.1978), this Court held that a liberty interest could be implicated by the manner in which a job applicant is turned down.[8] Larry applied to the Civil Service Commission to be put on a list of eligible applicants for federal jobs. The Commission rated him ineligible (because of his employment record and habitual use of alcohol); the effect of this finding was to bar Larry from federal employment for a period of up to three years. 605 F.2d at 956. We applied the two-part analysis developed in *Board of Regents v. Roth* to determine if Larry had a protectable liberty interest: a liberty interest is implicated when (1) charges are made against an individual which might seriously damage his standing and associations in the community; or (2) the state imposes on an individual a stigma or other disability foreclosing his freedom to take advantage of other employment opportunities.[9] *Id.* at 957 (quoting *Roth,* 408 U.S. at 573–574, 92 S.Ct. at 2707). *See also Munson,* 693. We decided that the second situation existed in Larry's case, even though the Commission's findings were not made public:

> [T]he federal government is composed of many different agencies and departments, all of which could obtain the information under various circumstances. In effect, Larry has been stigmatized throughout the entire federal government. He is deprived of the opportunity to work in any capacity for any branch of the government.

*Id.* at 958. *See also Velger v. Cawley,* 525 F.2d 334, 336 (2d Cir.1975), reversed on other grounds *sub nom., Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (per curiam); *Doe v. United States Civil Service Comm'n,* 483 F.Supp. at 570–571.[10]

Perry's case is distinguishable from *Larry* in that Perry is not absolutely barred from federal employment, but the practical effect of the FBI report is close enough to the employment bar in *Larry* to convince us that Perry is entitled to the due process protections provided by the Fifth

---

**8.** A more recent case reaching a similar conclusion is *Bartel v. Federal Aviation Administration,* 725 F.2d at 1414–1415 (employee given temporary GS–12 job after being denied permanent GS–13 position because of alleged misconduct in prior FAA job); *see also Doe v. United States Civil Service Comm'n,* 483 F.Supp. 539 (S.D.N.Y. 1980) (applicant for White House fellowship turned down after investigation discovered allegations of theft about plaintiff).

**9.** In *Roth,* the Supreme Court gave several examples of statements fitting within the first category: accusations of dishonesty or immorality or statements damaging one's name, reputation, honesty or integrity. 408 U.S. at 573, 92 S.Ct. at 2707. While the statements in the FBI report arguably accuse plaintiff of criminal conduct (impersonating law enforcement officers, *see* 18

U.S.C. §§ 912, 913), he does not contend that he is covered by the first branch of *Roth.* He argues on appeal only that the stigmatizing nature of the FBI report has made it impossible to get a job in the law enforcement field.

**10.** This *Doe* case is analogous to the instant action. After the plaintiff applied to be a White House fellow, the Fellowship Commission asked the Civil Service Commission ("CSC") to investigate her background. Two people told the investigators that Doe was a thief. Doe was not selected to be a fellow. Like the FBI report at issue here, the CSC report was available for use by other federal agencies. 483 F.Supp. at 570–571. The district court (Tenney, J.) ruled that the CSC deprived Doe of a liberty interest without due process and ordered that Doe be given an opportunity to clear her name.

Amendment. To begin with, any federal agency considering Perry for a law enforcement job will undoubtedly check plaintiff's FBI files. Perhaps the allegations in the report would matter less if Perry did not want to work in law enforcement, but the Constitution protects the liberty to follow the profession of one's choosing. *Schware v. Board of Bar Examiners*, 353 U.S. 232, 238, 77 S.Ct. 752, 755, 1 L.Ed.2d 796, *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136, 1138 (7th Cir.1984); *see Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042. And in any event, the government informs us in its brief that a check of the FBI's investigative files is mandatory for all of the federal government's prospective civilian employees. Appellee's Brief at 22 (citing Exec. Order No. 10,450, § 3(a) (April 27, 1953) and Federal Personnel Manual, Chap. 736, subchap. 1, § 1–2e). This means that the effect on Perry is almost identical to the effect on Larry we found protected by the Due Process Clause; while Perry is not barred from all federal employment, the seriousness of the report's accusations makes it extremely unlikely that anyone reading the report would hire him, particularly in the law enforcement field.[11] Perry, like Larry, has been stigmatized throughout the federal government.

Another factor in our decision in *Larry* was the length of time during which Larry was barred from all federal employment: three years. In contrast, the FBI report on Perry has been in his investigative file— and thus required to be reviewed by all prospective federal employers—for nearly nine years. The seemingly permanent existence of this report combined with the seriousness of its accusations convince us that the due process guarantees of the Fifth Amendment must come into play. The scope of the denial of employment opportunities—when viewed in terms of its practical effect—is only slightly narrower than the absolute ban in *Larry*, but the duration of this denial is, as of this writing, nearly three times greater.

■ It is true that the agencies that refused to hire Perry theoretically could have given him a job in spite of the FBI report or might not have hired him anyway.[12] But a realistic appraisal of the effect of the report leads inexorably to the conclusion that a prospective employer will not hire the subject of a report containing allegations of misbehavior as serious as those present here. The allegations in the FBI report go far beyond making Perry "somewhat less attractive to some other employers," *Roth*, 408 U.S. at 574 n. 13, 92 S.Ct. at 2707 n. 13, or forcing Perry "down a few notches in the professional hier-

11. Some of the liberty interest cases involve legal barriers to employment, *e.g., Truax v. Raich*, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (statute limiting the number of aliens an employer could hire); *Larry v. Lawler*, or suggest that such barriers are a prerequisite to maintaining a liberty interest claim, *Adams v. Walker*, 492 F.2d 1003, 1008–1009 (7th Cir.1974). Recent decisions of this Court, however, recognize that a liberty interest may be implicated even though there is no absolute bar to future employment. *See Munson v. Friske*, 754 F.2d at 693 (7th Cir.1985) (a liberty interest is implicated where charges result in permanent exclusion from or protracted interruption of employment); *Lawson*, 725 F.2d at 1139 (quoted *infra*); *Smith v. Board of Education of Urbana*, 708 F.2d 258, 265 (7th Cir.1983) (the Constitution requires that school board members "not make public statements so critical of plaintiffs' coaching abilities that it would be virtually impossible for them to find new employment in similar coaching positions"); *see also Lipp v.*

*Board of Education of Chicago*, 470 F.2d 802, 805 (7th Cir.1972) (due process might require a hearing if government action "were to diminish [plaintiff's] chances of obtaining employment significantly") (quoted with approval in *Hadley v. County of Du Page*, 715 F.2d 1238, 1247 (7th Cir.1983), certiorari denied, — U.S. —, 104 S.Ct. 1000, 79 L.Ed.2d 232).

12. In fact, affidavits from two BATF officials (executed nearly five years after the BATF withdrew its tentative offer of employment to Perry) state that even without the FBI report the agency would not have hired Perry on the basis of its own independent investigation. The record contains no similar affidavits from officials of the three other federal agencies that refused to hire Perry. There is no evidence that these agencies conducted independent investigations of plaintiff's background or independently attempted to verify the information contained in the FBI report.

archy," *Munson v. Friske,* at 683, neither of which would implicate a liberty interest. Rather, the report contains allegations of serious misconduct reflecting upon Perry's honesty and mental stability and indicates that he is unfit to serve as a law enforcement officer. *Cf. Greene v. Finley,* 749 F.2d 467, 472 (7th Cir.1984); *Krause v. Small Business Administration,* 502 F.Supp. 1332, 1339 (S.D.N.Y.1980). The FBI report has effectively deprived Perry of the opportunity to work for the federal government in any capacity or as a law enforcement officer anywhere. When the government refuses to hire someone because of accusations "likely to make him all but unemployable in the future ... the consequences are so nearly those of formally excluding him from his occupation that the law treats the state's action the same way, and insists that due process be provided." *Lawson,* 725 F.2d at 1139.[13] *See generally Doe v. United States Dept. of Justice,* 753 F.2d 1092, 1108–1112 (D.C. Cir.1985).

■ Justice Jackson's reminder of the importance of the interest at stake in cases like this is particularly apropos to the law enforcement profession. "To be deprived not only of present government employment but of future opportunity for it certainly is no small injury when government employment so dominates the field of opportunity." *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 185, 71 S.Ct. 624, 655, 95 L.Ed. 817 (Jackson, J., concurring). The Second Circuit, per Justice Clark, had similar thoughts in *Velger v. Cawley,* 525 F.2d at 336, when it dis-

cussed the devastating effect that an accusation of attempted suicide in a discharged probationary policeman's personnel file could have on the officer's future employment prospects:

> Police authorities must, therefore, exercise the greatest degree of care in dealing with probationary officers to make certain not only that their discharge decisions are just but also that their reasons are kept confidential. Here New York City admits that it grants ready access to its confidential personnel files to all governmental police agencies. In a case like the present one this could have the effect of closing the public sector to the probationary police dischargee and depriving him of employment in the largest and most desirable segment of his profession. The same result, in reality, is true in the private sector because New York City answers all inquiries for permission to see personnel files with the suggestion that inspection will be permitted with the consent of the dischargee. The dischargee is then placed "between the devil and the deep blue sea"; he loses whatever his choice. Who would employ an applicant who refused to give authorization? Who would employ one who gives authorization but whose file suggests that he made an "attempt" at suicide? [14]

*See also Bartel v. Federal Aviation Administration,* 725 F.2d 1403, 1415 (D.C.Cir. 1984) (denial of right to be considered for government employment in aviation may have effectively abridged freedom to take advantage of government employment); *Old Dominion Dairy Products, Inc. v. Secretary of Defense,* 631 F.2d 953 (D.C.

13. It does not matter that the report contained allegations of third parties rather than assertions of fact by the FBI (the report's first page stated that it "contains neither recommendations nor conclusions of the FBI"). It is the effect of the FBI report on Perry's future employment prospects with which we are concerned, not the sources of the statements contained in the report.

14. This explains why there can be a due process violation even though plaintiff consented to the release under the Privacy Act. *See* Part III *supra.* If Perry did not consent to the release of the information found in the FBI's files, he

could not be hired by the federal government because a check of the FBI's investigative files is mandatory. And once Perry consented and his prospective employer read the FBI report, he almost certainly would not be hired. Either way, law enforcement employment opportunities for Perry are effectively foreclosed. *See Pollock v. Baxter Manor Nursing Home,* 706 F.2d 236, 242 (8th Cir.1983) (McMillian, J., dissenting), *modified,* 716 F.2d 545 (8th Cir.1983) (per curiam); *compare Green v. Board of School Commissioners of Indianapolis,* 716 F.2d 1191, 1193 (7th Cir.1983).

Cir.1980) (due process guarantees apply when government barred contractor from virtually all government work, effectively putting contractor out of business); *cf. Cleveland Board of Education v. Loudermill,* —— U.S. ——, ——, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985, recognizing the severity of depriving a person of the means of livelihood).

## V.

Because the FBI report contains allegations of behavior that effectively foreclose Perry's chances of being employed in the law enforcement field, or being employed by the federal government in any capacity, the report implicates a liberty interest within the meaning of the Fifth Amendment. Whether the FBI has deprived Perry of a liberty interest without due process is left to the district court on remand; the district court never reached the question of what process was due plaintiff since it concluded that the report did not implicate his liberty interest. We would prefer to have the District Judge's views on the issue before reaching the question here. Likewise, we leave to the District Judge the appropriate relief should a due process violation be found. We would, however, like to provide some guidance for the proceedings on remand.

The question of what process is due has two components in the context of this case: (1) whether the FBI has already provided Perry with sufficient opportunity to refute the allegations contained in the report (i.e., whether the government complied with due process); and, if not, (2) an opportunity for Perry to clear his name (i.e., a remedy for the constitutional violation). *See Codd v. Velger,* 429 U.S. at 627, 97 S.Ct. at 883, *Roth,* 408 U.S. at 573 n. 12, 92 S.Ct. at 2707 n. 12. There are several possible arguments that Perry's due process rights have not been violated, keeping in mind that "[a]n essential principle of due process is that a deprivation of life, liberty or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Loudermill,* —— U.S. at ——, 105 S.Ct. at 1493, (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656–657, 94 L.Ed. 865). First, the government argues in a footnote that Perry had an opportunity to dispute the allegations in an "informal give-and-take," *see Board of Curators of the University of Missouri v. Horowitz,* 435 U.S. 78, 86, 98 S.Ct. 948, 953, 55 L.Ed.2d 124; *Goss v. Lopez,* 419 U.S. 565, 584, 95 S.Ct. 729, 741, 42 L.Ed.2d 725, when he talked on the telephone with two BATF officials after the agency decided not to hire him. A second possibility is that Perry's efforts to clear his record through the United States Civil Service Commission ("CSC") provided him with an adequate opportunity to contest the accusations in the report.[15] *Cf. Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648; *Bartel v. Federal Aviation Administration,* 725 F.2d at 1415. A third alternative is that the remedies available under the Privacy Act to amend one's records satisfy due process.[16] Of course we express no opinion on any of these options nor do we wish to foreclose the district court from considering others; rather, we mention them only to illustrate

---

**15.** The record contains a 1978 letter from the CSC to Perry informing him of a "favorable determination" in his case. Plaintiff's brief states that the CSC conducted an intensive investigation into plaintiff's suitability for federal employment and ordered the restoration of his name to employment eligibility rosters. Our review of the record has not disclosed the scope of the CSC investigation or the extent to which its results were disseminated to various federal agencies.

**16.** In 1978 plaintiff sent a letter to William Webster, Director of the FBI, requesting that his file be amended pursuant to 5 U.S.C. § 552a(d)(3). Webster refused to expunge the material identified by Perry, explaining that retention of the information did not violate the Privacy Act and that it was "relevant and necessary" for the FBI to "retain our later information concerning you to supplement our record of your 1968 FBI employment." Perry's letter challenging the accuracy of the information was placed in his file and will be provided, according to Webster's letter, to anyone reading the file. *See* § 552a(d)(3).

the issues that should be considered on remand.

■ Similarly, if the district court concludes that Perry's due process rights were violated, the court should fashion a remedy that is consistent with the principle that due process is a flexible concept whose procedural protections depend on the peculiar circumstances of each case. *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484. Due process requires an opportunity to be heard at a meaningful time and in a meaningful manner, *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 901, 47 L.Ed.2d 18, but application of that standard in a particular case depends upon consideration of three factors: the private interest affected; the risk of an erroneous deprivation; and the government's interest, including the financial and administrative burdens additional procedures would require. *Id.* at 335, 96 S.Ct. at 903; *see Doe v. United States Dept. of Justice*, 753 F.2d at 1112–14; *Larry v. Lawler*, 605 F.2d at 959–963; *see generally Krause v. Small Business Administration*, 502 F.Supp. at 1339–1342; *Doe v. United States Civil Service Comm'n*, 483 F.Supp. at 572–75. The district court, as fact-finder, is in a better position than this Court, on the record that now exists, to assess these factors.

We wish to emphasize that we are not holding that the FBI must provide all job applicants with an opportunity to refute allegations contained in FBI reports when the reports are transmitted to a prospective employer. Such a requirement could significantly impede the FBI's principal function of investigating criminal activity. Rather, a meaningful opportunity to be heard must be given only when the FBI report implicates a liberty interest. This means that cases such as the one before us will arise only when (1) the subject of the report contests the truthfulness of the information found in the report, *Codd v. Velger*, 429 U.S. at 627–28, 97 S.Ct. at 883–

84; and (2) the report—made public or easily available to prospective employers, *see Bishop v. Wood*, 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684—contains statements falling within one of the two categories identified in *Roth*, 408 U.S. at 573–574, 92 S.Ct. at 2707. *See supra* at 1277. The paucity of reported decisions involving job applicants asserting deprivation of a liberty interest suggests to us that such cases will be few and far between.

## VI.

■ One other issue warrants discussion. It is not clear from the briefs whether Perry is appealing the ruling on his due process claim against the FBI only or against the other defendants as well. If he is appealing the claim as to all the defendants, the judgment is affirmed as to all but the FBI. Assuming the falsity of the report, the FBI has deprived Perry of a liberty interest because it compiled the report and is in a position to disseminate it—indeed, is required to disseminate it—whenever a federal agency is considering hiring Perry. Moreover, it is conceivable that state and local law enforcement agencies as well check the FBI's files before hiring new personnel.[17] This is not true for the other agency defendants. They have not hired Perry but they have not done anything to make it impossible, or virtually impossible, for plaintiff to work in law enforcement. The defendant agencies have refused to hire Perry for particular positions, but they have not deprived him of the opportunity to follow his chosen profession.

## VII.

Accordingly, we reverse the district court with respect to plaintiff's due process claim against the FBI, affirm the judgment in favor of the FBI on plaintiff's Privacy Act claims, and affirm the judgment in favor of the remaining defendants on plain-

---

**17.** In fact, plaintiff states in an affidavit that BATF agent Potter told him that he should look for work in the private sector because Perry would never again obtain a law enforcement job.

tiff's due process claim. The case is remanded for further proceedings consistent with this opinion.

HARLINGTON WOOD, Jr., Circuit Judge, dissenting.

The majority opinion is a very fair examination of all the issues. I fully concur in the affirmance of the Privacy Act issues, but I am not quite convinced on the due process issue, and therefore respectfully dissent, but only to that extent.

As the majority opinion itself points out, this case may be distinguished from *Larry v. Lawler*, 605 F.2d 954 (7th Cir.1976) (Wood, J., dissenting) because there is no broad and absolute ban barring Perry from all federal employment. Nevertheless, the majority considers *Larry* to be close enough to be controlling. I do not because the majority stressed in *Larry*, 605 F.2d at 958 that "It must be remembered that Larry has not merely been denied a particular position within the government; he has been totally debarred from all federal employment for up to three years." After that three years was up, then it would also be necessary for Larry to convince the United States Civil Service Commission of his rehabilitation and fitness for appointment in a new determination. 5 C.F.R. § 731.303 (1984).

Perry faces no absolute federal employment ban although the majority speculates that the FBI information "makes it extremely unlikely" that anyone would hire him for a federal position. Perry, however, did subsequently apply to the Commission to be placed on the list of eligible applicants for employment consideration by the various agencies and departments within the federal government, and was successful. But Perry nevertheless continues to complain about his failure to be hired by four particular federal law enforcement agencies.

Perry sought law enforcement positions with the Bureau of Alcohol, Tobacco and Firearms (BATF), United States Marshals Service (USMS), Department of Agriculture (DOA), and the Internal Revenue Service (IRS). All four agencies rejected Perry's application. The blame for those rejections is placed on the Federal Bureau of Investigation (FBI) which upon request from BATF, but only after Perry had authorized the release of information contained in police and criminal records, sent the requested information to BATF.

The FBI personnel background information was contained in a five-page memorandum which was excised before distribution to BATF. That memorandum clearly states, however, that what it contains constitutes neither recommendations nor conclusions of the FBI. The memorandum advises that Perry was employed for several months as a clerk by the FBI when he was 18 years old. The reason for his brief tenure is not given. The information the memorandum contains undoubtedly could be expected to be of interest to any federal law enforcement agency considering Perry for employment.

For example, the first bit of information comes not from some unnamed informant of questionable reliability, but from Perry's own father, Reverend Perry, who advised the FBI that his son, Perry, had told him that he had been required to carry a weapon when he was a clerk for the FBI, and that even though he was no longer employed by the FBI there was still the possibility that he would be called upon for a covert assignment. Perry's quarrel should be with his father. Anyone with any knowledge of the FBI must realize that its 18 year old clerks without agent training are not authorized to carry guns.

An informant whose name was excised advised the FBI that he overheard Perry in a bar claim to be a federal officer and that he had served a subpoena in a federal investigation. As might be expected, the United States Attorney for the Northern District of Illinois declined prosecution under the impersonation statute, but the United States Attorney did request that Perry be interviewed and admonished. It does not appear in the memorandum that Perry did any more than talk in a bar about being a federal officer. The report does not al-

lege that Perry served any subpoena as a federal officer. To violate the statute a person must in fact act as a federal officer or obtain something of value. 18 U.S.C. § 912. Perry was admonished and the memorandum states that Perry "vehemently denied ever representing himself as a Federal Officer."

Another sample item again from an informant indicates that Perry had flashed a United States Marshal's badge in a bar, and was. armed. The United States Attorney likewise declined prosecution on this charge. It was only talk as no actual use was made of the badge. Being armed would ordinarily be a local matter. Another item reported Perry used a red light and siren in his car to stop other vehicles for some reason and that it cost him his job on the Deerfield Police Department. A local police agency reported that Perry while driving was stopped by one of its officers. A red light and siren were noted. No charges were filed by the officers, but the officers confiscated a blackjack and a tear gas pen with cartridges. Again the report contained Perry's explanation that the siren was merely a car alarm, and that he was a dispatcher for the Illinois State Police. Apparently he was a dispatcher for a few months, but resigned. It was reported by the Illinois State Police that Perry would not be eligible for rehire because of poor attitude, failure to obey orders, and allegedly receiving personal gasoline discounts for official favors as a dispatcher. It was also reported that Perry had a state trooper-style hat he wore while driving on the toll road. He was investigated by the state for impersonating a state trooper, but no disposition is shown. Perry was also hired as a dispatcher by a local police department, but for some undisclosed reason that lasted only one night.

BATF, like the other federal agencies, is a sophisticated federal law enforcement agency. BATF did not rely on the FBI information, but conducted its own independent background investigation of Perry and then declined to hire him. Most of what was contained in the FBI memorandum, even without the names of the informants

except for Perry's father, was easily subject to verification since most of it directly involved other police agencies. Perry knew where he had worked, why employment was terminated, and when and for what he had been stopped, questioned, and admonished. The information was clearly designated not to be construed as a recommendation nor a conclusion of the FBI. The information was presented in a straightforward manner without editorial comment, and even contained several direct denials by Perry. Had the memorandum gone to some private source not capable of evaluating that type of raw information nor having the capability of checking it out, we would have a different case. Nor does the report directly accuse Perry of an act of dishonesty that might be criminal. Perry's own barroom talk is not sufficient. He was not, for instance, labeled as an embezzler or a thief. Nor is there anything in the report to suggest any immorality whatsoever. Those accusations are examples cited in *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972) as implicating a liberty interest. The memorandum information about Perry approaches nothing involving moral turpitude.

There is a pattern of conduct, however, which emerges in the reported items which fully justified dissemination by the FBI to serve as leads but obviously requiring further verification by any interested law enforcement agency. But putting all that impersonation conduct aside, the Illinois State Police evaluation of Perry after termination of his employment with that agency stating that Perry would not be rehired because of poor attitude, failure to obey orders, and misuse of his job for personal gain is classic employment information not within any police or criminal record category. That information alone, also easily verifiable, would justify employment rejection by a federal law enforcement agency making all the other items in the FBI memo surplusage. It is difficult to imagine that a federal law enforcement agency would hire an employee who would not be rehired for

good reason by a state law enforcement agency. Perry does not deny he was hired by the Illinois State Police and should have expected that his former employer would give an evaluation of him separate from any FBI report.

For the FBI not to have passed on the pertinent information concerning closed investigations and investigative leads to another federal law enforcement agency contemplating hiring Perry as an agent would have been, as I see it, a dereliction. Therefore, I do not see it as a due process violation when the FBI did what was sensible and practical. There was no federal employment ban imposed on Perry by regulation. The agencies were free to make their independent choices and exercise their individual discretions. Perry was given the opportunity to dispute the information directly by letter, by phone, and in person and did so. Any additional due process requirements would constitute an unnecessary burden on federal law enforcement hiring practices. It is better for a federal law enforcement agency not to hire than to be later unpleasantly surprised by a new employee's unstable conduct which could have serious public safety consequences.

But, even if it is to be considered a possible due process violation, Perry's interviews, denials, and his use of the FBI procedures for labeling the information in the FBI file as disputed together with his pursuit of a U.S. Civil Service Commission remedy provided all the due process he deserved. Federal law enforcement positions are too critical and sensitive to make it unnecessarily difficult for one federal law enforcement agency to pass pertinent investigative leads to another federal law enforcement agency. On balance, the risk to public safety far outweighs the possibility that some potential employer might rely on the mere bits of information in the FBI file without more in rejecting an otherwise qualified applicant. The information in the file did not constitute allegations, only unverified information easily recognized by a federal law enforcement agency for no more than it was. Even a possible chilling of Perry's federal employment by an adverse reflection on his reputation is not an employment ban and does not amount to a deprivation of liberty. *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). A mere failure to hire, considering all the circumstances of this case, does not meet the "stigma plus" standard as characterized in *Colaizzi v. Walker*, 542 F.2d 969 (7th Cir.1976), *cert. denied*, 430 U.S. 960, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977).

Therefore, in part, I respectfully dissent.