**Rixson Merle PERRY,
Plaintiff-Appellant,**

v.

**FEDERAL BUREAU OF
INVESTIGATION, et al.,
Defendants-Appellees.**

No. 82–1136.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 26, 1985.
Decided Jan. 23, 1986.

Berry Sullivan, Jenner & Block, Chicago, Ill., for plaintiff-appellant.

Harold J. Krent, Dept. of Justice, Washington, D.C., for defendants-appellees.

Before CUMMINGS, Chief Judge, BAUER, WOOD, CUDAHY, ESCHBACH, POSNER, COFFEY, EASTERBROOK, and RIPPLE, Circuit Judges.[*]

HARLINGTON WOOD, Jr., Circuit Judge.

The only issue considered by the court *en banc* is Perry's claim that a Federal Bureau of Investigation (FBI) memorandum contained adverse and false information about him which was circulated to certain other federal law enforcement agencies to which he had applied for employment. On appeal there was also a question raised about whether the circulation was done maliciously. As a result of that memorandum Perry claims he was not hired, thereby implicating a liberty interest protected by the Fifth Amendment. The general factual background of this controversy is set forth in Part I of the original panel opinion, but will be reviewed here.

Perry sought law enforcement positions with the Bureau of Alcohol, Tobacco and Firearms (BATF), the United States Marshals Service, the Department of Agriculture, and the Internal Revenue Service. All four agencies rejected Perry's application. Perry blames the FBI primarily for those rejections. After Perry had authorized the release of information contained in police and criminal records related to him, the FBI released the information contained in its investigative report to the requesting federal law enforcement agencies.[1] Based on this alleged improper FBI action Perry sought an injunction restraining further dissemination of the FBI memorandum, amendment of the FBI memoran-

dum, an order appointing Perry to one of the federal employment positions which allegedly he had been wrongfully denied, together with an award of back pay, costs, and attorneys' fees.

## I. Facts

### A. The "Cover Letter" Issue

The controversial FBI information about Perry was contained in a five-page memorandum which was excised before distribution to protect informants. This memorandum was not compiled for employment purposes, but was the result of an FBI criminal investigation because of allegations, which the United States Attorney declined to prosecute, that Perry had impersonated a federal officer. The memorandum states that what it contains constitutes neither recommendations nor conclusions of the FBI, and says nothing one way or the other about hiring Perry.

In Part I of the original panel opinion the possibility is suggested that a separate letter, characterized as a "cover letter," may have accompanied the FBI memorandum to the agencies. That "cover letter" stated that the FBI report "clearly reflects Perry's unstable nature." The majority opinion states, however, that the record does not disclose if in fact this "cover letter" was actually distributed to the interested federal agencies. Moreover, Judge Marovitz in his conscientious consideration of this case in a series of memorandum opinions makes no mention of the "cover letter," but does note that the "first page" of the memorandum itself clearly sets forth the admonishment that it contains neither recommendations nor conclusions of the FBI.

Perry now argues in a supplemental brief filed after oral argument that by in-

[*] Judge Flaum did not participate in the *en banc* consideration of this case.

1. In his *pro se* appeal brief Perry alleges that the BATF disseminated the FBI report to the Internal Revenue Service and the Department of Agriculture. Yet in his brief and at oral argument for the rehearing *en banc*, Perry's appoint-

ed counsel argued only about the FBI's dissemination of the report. Our opinion, therefore, refers only to the FBI in the discussion of the report's dissemination. Our analysis and the result, however, would remain unchanged even if the BATF had given the FBI report to the two other government agencies.

cluding the cover letter along with the five-page memorandum as an exhibit to his complaint he at least indirectly alleged its distribution by the FBI to the law enforcement agencies. Perry argues that he also "specifically averred that the FBI report was accompanied by the FBI cover letter." He did, but that is a little misleading. What he actually stated in his district court affidavit was that the five-page memorandum, prepared in the Chicago FBI office for Bureau Headquarters in Washington, was accompanied by the cover letter. There is no averment that FBI Headquarters then forwarded the cover letter to the agencies. Quite to the contrary, Perry's affidavit continually refers only to the distribution to the agencies of the "five-page" memorandum. With the cover letter it would have been six pages. It appears that the present cover letter issue on appeal was prompted only by the reference to it in the original panel opinion.

Our own examination of the "cover letter" reveals that it did not purport to be a cover letter conveying the report to the requesting agencies. It was instead, even as Perry states in his affidavit when considered in context, an in-house memorandum from the Special Agent in Charge of the FBI's Chicago office, where the report was compiled, addressed to the Director, FBI, Washington, D.C., enclosing the report of the closed investigation of Perry. That was prior to this employment problem. That cover letter found its way into this record because the FBI made it available to Perry along with more than a hundred other FBI documents in response to Perry's request under the Privacy Act. Nothing in the record suggests that this cover letter was or even may have been distributed to the requesting agencies. The FBI, therefore, expressed no opinions to the other agencies about Perry. The FBI internally may have viewed Perry as unstable, but it kept that view to itself. In his post-argument brief Perry concedes that dissemination of the cover letter is not essential to his liberty interest claim, only the five-page memorandum itself. Therefore, we no longer consider the "cover letter" to be a factor.

### B. The FBI Memorandum

The information that the FBI memorandum did contain undoubtedly could be expected to be of interest to any federal law enforcement agency considering Perry for employment. The memorandum advises that the FBI employed Perry when he was eighteen-years old for several months as a clerk. The first bit of outside information comes not from some unnamed informant, but from Perry's own father, Reverend Perry. Reverend Perry advised the FBI that his son had told him that he had been required to carry a weapon when he was a clerk for the FBI, and that even though he was no longer employed by the FBI there was still the possibility that he would be called upon for some covert assignment. By affidavit Perry denies that his father ever made those statements. We find no affidavit by his father, but that is immaterial.[2]

An informant told the FBI that he overheard Perry in a bar claim to be a federal officer and to have served a subpoena upon a county sheriff in connection with a federal investigation. As might be expected, the United States Attorney for the Northern District of Illinois declined prosecution under the impersonation statute,[3] but did request that Perry be interviewed and admonished. He was interviewed and vehemently denied the charge, as the memorandum reveals. It does not appear in the memorandum that Perry did any more than

---

**2.** Anyone with any knowledge of the FBI, however, must realize that its eighteen-year-old clerks without agent training are not authorized to carry guns.

**3.** 18 U.S.C. § 912 provides:
Whoever falsely assumes or pretends to be an officer or employee acting under the authority of the United States or any department, agency or officer thereof, and acts as such, or in such pretended character demands or obtains any money, paper, document, or thing of value, shall be fined not more than $1,000 or imprisoned not more than three years or both.

talk about being a federal officer and having served a subpoena. The memorandum does not allege that Perry actually served any subpoena pretending to be a federal officer. To violate the statute a person must in fact act as a federal officer or obtain something of value. 18 U.S.C. § 912.

Another sample item from an informant indicates that Perry was armed and flashed a United States Marshal's badge in a bar. The United States Attorney again declined prosecution on this charge. It was only talk, as Perry did not actually use the badge. Being armed would ordinarily be a local matter.

Another item reported that Perry, for some reason, used a red light and siren in his car to stop other vehicles and that it cost him his job on the Deerfield Police Department. Another local police agency reported that one of its officers stopped Perry while he was driving his own car. A red light and siren were noted. No charges were filed by the officers, but the officers confiscated a blackjack and a tear gas pen with cartridges. Again the memorandum contained Perry's explanation that the siren was merely a car alarm, and that he was a dispatcher for the Illinois State Police. Apparently he was a state police dispatcher for a few months, but resigned. An informant said Perry had a poor record with the state police.

A police agency also reported that Perry would not be eligible for rehire because of poor attitude, failure to obey orders and allegedly receiving personal gasoline discounts for official favors as a dispatcher. It was also reported that Perry had a state trooper-style hat he wore while driving on the Illinois State Toll Road and would pretend to talk over a car radio. He was investigated by the state for impersonating a state trooper, but no disposition is shown. One trooper said Perry had the reputation of "being slightly odd." Perry was also hired as a dispatcher by a local police department, but for some undisclosed reason that job lasted only one night.

### C. BATF's Actions

BATF, like the other federal agencies which considered Perry for employment, is a sophisticated federal law enforcement agency. BATF did not rely entirely on the FBI information, but conducted its own independent background investigation of Perry and then declined to hire him. The affidavit of the BATF official who decided not to hire Perry explains how that agency went about considering Perry for employment. In compliance with Executive Order 10450, a full field preemployment background investigation was initiated because the position Perry was being considered for was classified as "critical sensitive."

While the investigation was still in progress that official had a conversation with Perry in which Perry advised that the FBI memorandum was not accurate. Later the official received the BATF investigation report. It included some new allegations not in the FBI memorandum. One item was that during a discussion Perry had pulled a gun on an acting chief of police for whom he had once worked. Another was that Perry had falsified his employment application by not admitting a state arrest for questioning and by failing to list employment with the Illinois State Police and with two other local police departments, one of which had fired him. The mayor of one town where Perry had worked reported that Perry "would be scary with a gun and this city would not rehire him."

As a result of BATF's refusal to hire Perry the United States Civil Service Commission incorrectly advised Perry that the Commission had sustained a request from BATF to disqualify him for an agent's position, but that he had a right to appeal. Shortly thereafter the Commission corrected its position and advised Perry that the Commission had not disqualified him, only BATF had individually rejected him. Therefore, the Commission advised, Perry's name had been restored to the register for consideration for employment by other federal agencies. There was no ban on federal employment imposed, and there was

nothing left for Perry to administratively appeal.

## II. Liberty Interest Analysis

After this lawsuit was begun, Perry by his affidavit in response to a motion for summary judgment fully and explicitly denied each and every allegation in the FBI memorandum although as we later note he equivocated in his original objections in correspondence with the FBI. For our purposes in reviewing this summary judgment we accept Perry's latest statement, and consider the memorandum to have contained false information about him. The constitutional liberty interest issue must, therefore, be examined. There is no need, however, to discourse on due process generally in all job-related circumstances, only to examine the Perry liberty issue in its own particular preemployment factual setting.

### A. Larry v. Lawler

We are first confronted with our fairly recent opinion in *Larry v. Lawler*, 605 F.2d 954 (7th Cir.1978) (Wood, J., dissenting). Although recognizing that it was possible to distinguish *Larry* from this case because no broad and absolute employment ban barred Perry from all federal employment as was the situation in *Larry*, the majority in the original panel opinion in this case considered *Larry* to be close enough to be controlling. Larry had applied to the Civil Service Commission requesting that he be placed on the list of eligible applicants for employment consideration by various agencies and departments within the federal government. The Commission, as required by statute, conducted a standard background investigation to determine Larry's qualifications and suitability for employment. The investigation disclosed that Larry had a poor employment and arrest record and was a habitual and excessive user of intoxicants. The result was that under the statute Larry was totally barred from all federal employment for up to three years. The panel majority found a liberty interest on the basis that Larry had been stigmatized throughout the entire federal government and deprived of job opportunities in any of the branches of government for a substantial period of time. At the time of the panel's decision that three-year employment ban had terminated, but the majority considered that in reality the stigma had not come to an end, and therefore ordered Larry's adverse civil service record expunged.

No member of this *en banc* court has suggested that we fit *Perry* into the *Larry* mold, and, in the name of due process, expunge Perry's allegedly adverse law-enforcement-related record, and then proceed to grant Perry's request, even if we could, to appoint him to one of the federal law enforcement positions he was denied. Due process requires only fairness, not foolhardiness. If Perry does have a life, liberty or property interest in these preemployment circumstances, the Constitution requires that he be treated fairly and receive whatever due process fits the circumstances.

There may come a time when this court may have cause to reexamine *Larry*, but we need not do so now. Perry's difficulties are not government wide, nor is he subject to a statutory employment ban. His employment possibilities were confined to several law enforcement agencies within the executive branch, and those agencies were free to conduct their own background checks and to use their own employment discretion. The FBI did not purport to have done so. It is not its job to make job determinations for those agencies. The adverse information about Perry was not published nor distributed government wide.

The majority in *Larry* limited the application of *Larry* by emphasizing that Larry had not merely been denied a particular position, but had been totally disbarred throughout the government. *Larry*, 605 F.2d at 958. There is no justification for extending *Larry* to the present case. The majority in *Larry* did concede that the nature of Larry's liberty interest was difficult to define with exactitude. It is not so difficult, however, to determine that there is no liberty interest involved in *Perry* in its own narrow factual context.

Therefore, setting *Larry* aside, the basic starting point is to ascertain, as Judge Marovitz did, whether Perry's failure to be hired in these circumstances implicates a liberty interest of the type claimed. *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). It does not, but even if we considered that it did, Perry had the full measure of process due in this preemployment situation. The due process Perry apparently seeks is not an agency hearing about the allegations, but primarily the award to him of a federal law enforcement position.[4]

### B. Perry's Liberty Interest Claim

Although not claiming a life or property interest, Perry does claim a liberty interest. He does not, however, claim a liberty interest violation of the type which restrains him physically, only the liberty to be a federal law enforcement officer.

This is not the usual case where a government employee has been fired or not rehired. Neither party has cited any case dealing with a liberty interest in the preemployment context, and the court's own research has uncovered only two cases on the issue. Both of these cases summarily conclude that an unsuccessful applicant for federal employment has no interest requiring due process protection absent "infringement of a liberty interest such as reputation or free speech, [or] impairment of ... [the applicant's] ability to get another job." *Carmi v. Metropolitan St. Louis Sewer District*, 620 F.2d 672 (8th Cir.), *cert. denied*, 449 U.S. 892, 101 S.Ct. 249, 66 L.Ed.2d 117 (1980). *See also Thompson v. Link*, 386 F.Supp. 897 (E.D.Mo.1974).

In the more serious situation of a firing or failure to rehire a government employee, a liberty interest is implicated if "either (1) the individual's good name, reputation, honor or integrity are at stake by such charges

as immorality, dishonesty, alcoholism, disloyalty, Communism or subversive acts or (2) the state imposes a stigma or other disability on the individual which forecloses other opportunities...." *Munson v. Friske*, 754 F.2d 683, 693 (7th Cir.1985). This case does not fall within any of the categories mentioned in *Carmi* and *Munson*. The FBI has neither injured Perry's reputation nor foreclosed his employment opportunities, and Perry does not allege an infringement of free speech.

### 1. Injury to Reputation

█ Perry has not sustained an injury to reputation cognizable under the due process clause. The FBI memorandum does not accuse Perry of an act of dishonesty that might be criminal. Perry's barroom talk is not of great moment. The FBI, for instance, did not label him as an embezzler or a thief. Nor is there anything in the memorandum to suggest any immorality whatsoever. Those types of accusations are examples cited in *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972) as implicating a liberty interest. The memorandum information about Perry approaches nothing involving moral turpitude. *See Lawson v. Sheriff of Tippecanoe County, Ind.*, 725 F.2d 1136, 1138 (7th Cir.1984).

The memorandum states, for example, that in October 1974, a United States Attorney declined to prosecute Perry for impersonating a federal officer, but asked that Perry be interviewed and admonished. Perry argues that this admonishment stigmatizes him because it suggests "to any knowledgeable reader that the United States Attorney believed the allegations in the report were true." That is not a reasonable inference, as it could also be speculated that the admonition was only pre-

---

4. On appeal, Perry requests a hearing, but does not specify who should hold the hearing or what the scope of the hearing should be. At rehearing *en banc*, Perry contends that the FBI must afford him due process and concludes that he is "entitled to an opportunity to refute the charges in the [FBI] report and clear his name." In a footnote to his brief for the rehearing *en*

*banc*, Perry suggests remand to the district court to determine what process was due and whether Perry received it. Remand to the district court, however, is not necessary as Perry's interviews, denials, and his pursuit of a U.S. Civil Service Commission remedy provided all the due process he deserved even if he has a liberty interest which was harmed.

cautionary and did not represent a determination that the allegations were true. In any event, whatever the United States Attorney may have believed is immaterial. The memorandum's description of the admonishment does not amount to a stigma.

Most of what was contained in the FBI memorandum, even without the names of the informants (although Perry's father was identified), was easily subject to verification by the receiving agencies since most of it directly involved other police agencies in the same general area. Likewise Perry knew where he had worked, why employment was terminated, and if and when and for what he had been stopped, questioned and admonished. Most was information he should have had little trouble refuting. In addition to being clearly designated that it was not to be construed as a recommendation nor a conclusion of the FBI, the information was presented in a straightforward manner without editorial comment. The memorandum also contained several direct denials by Perry made at the time of the various incidents.

The memorandum was not distributed to some agency not capable of evaluating or verifying that type of raw information. The memorandum specifically instructs that it is the property of the FBI and is merely being loaned to the requesting agency. It further directs that the memorandum and its contents are not to be distributed outside that particular agency. There was no general widespread publication of the memorandum even within the government. The memorandum's distribution was strictly limited to a few specified law enforcement agencies all within the executive branch of the federal government. We need not, therefore, consider at this time the consequences of any potential for wider distribution of this or similar memoranda.

It is difficult to determine from an examination of the maze of pleadings, amended complaints, exhibits, affidavits, and briefs just exactly what information in the memorandum Perry claimed from time to time was false. Before this litigation began Perry wrote the Director of the FBI and took up the memorandum incidents one at a time. In that letter, for instance, he asks that the paragraph about him impersonating an officer be deleted as the incident was not sufficient to warrant prosecution. He does not deny that in fact he did what the report said he did. Likewise he asks that the paragraph about having a deputy marshal's badge be deleted because no prosecution was commenced. Again he does not deny that in fact he flashed the badge of a federal officer. It was reported that he carried numerous weapons in the trunk of his car. He does not deny it, but says he sees no relevance to it. Another item reported him carrying a .44 magnum pistol and having a police radio. Perry says that should be expunged since he had not been convicted for it. He does not deny the truth of the information. He also asks generally for deletions of all references to impersonating officers since he was not convicted. He does not deny the impersonations. Perry also claims that some things never happened.

Even if Perry had originally and explicitly denied each and every item in the memorandum, however, there is a pattern of conduct which emerges which fully justified the FBI's dissemination of the memorandum to interested federal law enforcement agencies to serve as employment investigative leads, but leads which obviously required further verification. It was not the responsibility of the FBI to run out all these leads for the employment purposes of other agencies. The FBI was neither hiring Perry nor advising any other agency about hiring him. The FBI file was the result of an investigation of Perry for allegedly impersonating federal officers. The agencies could follow the leads or ignore them in their own discretion. The agencies could hire or not in their own discretion. The FBI never imposed a ban on hiring Perry.

Putting all Perry's impersonation and other conduct aside, the various police agency evaluations of Perry for which he had worked which stated, for instance, that

Perry would not be rehired because of poor attitude, failure to obey orders, and misuse of his job for personal gain is classic employment information, not within any police or criminal record category. That information alone, easily verifiable, could justify employment rejection by a federal law enforcement agency. Perry, however, did not make known on his employment application those short-time jobs in law enforcement which may have had unsatisfactory conclusions.

### 2. Stigma or Disability Foreclosing Job Opportunities

The FBI did not impose a stigma upon Perry which foreclosed his employment opportunities. *Adams v. Walker*, 492 F.2d 1003 (7th Cir.1974), somewhat clarifies the meaning of the word "stigma." After examining the cases cited in *Board of Regents v. Roth*, this court in *Adams* concluded that no stigma to reputation occurred when the Governor of Illinois dismissed the plaintiff from his position as chairman of the Illinois Liquor Commission for incompetence, neglect of duty and malfeasance in office. The *Adams* court noted that "nothing in the complaint even remotely suggests a legal barrier to future employment analogous to denial of admission to the bar, disqualification from all government employment, ... or sending substantial adverse information to a professional licensing agency." 492 F.2d at 1009.

No legal barrier to Perry's future employment in the government or elsewhere was ever imposed, except for a short period due to a mistake of the Civil Service Commission which caused him no harm. No barrier exists now. The record contains a letter dated May 1, 1978 from the Civil Service Commission informing Perry that "this office has made a determination in your favor based on known suitability matters.... Your eligibility will provide you with full consideration for all positions for which you qualify." Perry's brief confirms that the Commission "conducted an intensive investigation" and "ruled that plaintiff was suitable for ... [federal] employment and ordered the restoration of plaintiff's name to all eligibility rosters on which he had attained placement."

■ Although dissemination of the FBI memorandum may have lessened Perry's employment opportunities in certain areas of the federal government, a liberty interest is not implicated merely by a reduction in an individual's attractiveness to potential employers. *Lipp v. Board of Education of City of Chicago*, 470 F.2d 802, 805 (7th Cir.1972), *quoted with approval in Hadley v. County of DuPage*, 715 F.2d 1238, 1247 (7th Cir.1983). *See also Roth*, 408 U.S. at 575, 92 S.Ct. at 2708 ("It stretches the concept of liberty too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another.").

The FBI conduct about which Perry complains was not disciplinary or punitive. The FBI conducted a routine investigation of Perry on possible criminal charges. An argument arose on appeal about whether the FBI acted "maliciously" in disseminating the memorandum, or had "intentionally" fabricated the incidents. We cannot find in the record that Perry attempted to show that the FBI actually fabricated false information and distributed it with some malicious intent. At most the FBI information was only incorrect. Judge Marovitz did not mention any claim of deliberate falsification. If the FBI had some malicious intent it likely would have included in its memorandum other uncomplimentary information it had about Perry.[5] It could also have slanted the report and included some admonition about not hiring Perry. The FBI did none of these things. In his post-argument brief Perry himself, however, helps lay that "malicious" and "inten-

---

5. Some information the FBI had, for instance, was not in its memorandum. Perry, it is said, enrolled in Trinity College and advised college officials that he needed certain special considerations including a private dormitory room, pri-vate phone, and a locked storage cabinet as a condition of his FBI employment. The college officials, it appears, may have believed him and provided him with these rather unusual college amenities.

tional" issue argument to the side, and takes the position that "malicious" dissemination and "intentional" fabrication are not essential elements of his liberty claim. Perry relies only on the five-page memorandum. That side issue of the case, therefore, need no longer be pursued.

■■■ The BATF conducted its own investigation and did not rely exclusively upon the FBI report in making its employment decision. The BATF officer who made the employment decision stated that even without the FBI report and based on BATF's own investigation he would have concluded that Perry was not suitable for employment as an agent. BATF's decision determined only that Perry was not suitable for one particular job; BATF neither publicly criticized Perry nor expressed any opinion about Perry's suitability for another government position. BATF simply exercised its own judgment about the desirability of hiring Perry for a specific position in that one agency. A mere failure to hire, considering all the circumstances of this case, does not meet the "stigma plus" standard as characterized in *Colaizzi v. Walker*, 542 F.2d 969 (7th Cir.1976), *cert. denied*, 430 U.S. 960, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977).[6]

### III. Due Process Claim

■■■ As the government has neither injured Perry's reputation nor imposed a stigma foreclosing his employment opportunities, the government has not deprived Perry of any liberty interest protected by the Fifth Amendment. However, even assuming that Perry has a liberty interest which the government's actions have infringed, Perry has received full measure of the process he is due.

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593,

2600, 33 L.Ed.2d 484 (1972). Perry's original request to be appointed to a federal job far exceeds the necessary relief appropriate to this case if the FBI did violate due process by giving the memorandum to other government law enforcement agencies. Perry's vague request on appeal and at rehearing for a hearing to "clear his name" has in essence been satisfied as Perry had numerous opportunities, short of a full hearing, which he took advantage of to protect his interests. A hearing of some kind to be held by some agency was not necessary to satisfy the mandates of due process.

■■■ The function of a due process hearing is "to provide the person an opportunity to clear his name." *Roth*, 408 U.S. at 573 n. 12, 92 S.Ct. at 2707 n. 12. Perry had ample opportunity to "clear his name" and to refute the information in the FBI memorandum through a variety of channels other than by a full hearing. The memorandum itself contains Perry's denials and explanations. Perry discussed the memorandum in detail with various federal officials in person, by letter, by phone and submitted exculpatory material in writing. Perry conferred with the Civil Service Commission and had his name reinstated on the eligibility roster.

Perry was given several opportunities at various times to dispute the allegedly false information in the FBI memorandum. The FBI memorandum itself contains Perry's denial of at least one incident and Perry's explanation of another. After BATF's rejection Perry had phone conversations with two BATF officials, the official who declined to hire Perry and the official in charge of the background investigation. Among other things, the FBI memorandum was mentioned and Perry was given an opportunity to explain the events reported.

Perry also wrote to the Director of the FBI listing in detail specific changes he

---

**6.** This court's interpretation in *Colaizzi* of the holding in *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), has become known as the "stigma plus" test. The *Colaizzi* court stated that, although a stigma to reputation alone

does not constitute a deprivation of liberty, "infliction of a stigma to reputation accompanied by a failure to rehire (or *a fortiori*, by a discharge) states a claim for deprivation of liberty without due process...." 542 F.2d at 973.

wanted made in the memorandum. Although the FBI refused to expunge the material as Perry requested, it did put Perry's letter challenging the memorandum's accuracy in its file.

■ Even if we were to find that Perry has a liberty interest, additional due process requirements would constitute an unnecessary and impractical burden on federal law enforcement practices. Federal law enforcement positions are too critical and sensitive to make it unnecessarily difficult for one federal law enforcement agency to pass pertinent investigative leads to another federal law enforcement agency for its consideration.

Perry may have suffered a serious deprivation in not being hired for a government job, but the private interest involved is only one of three factors to be weighed in the due process analysis. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1975); *Board of Curators v. Horowitz*, 435 U.S. 78, 86 n. 3, 98 S.Ct. 948, 953 n. 3, 55 L.Ed.2d 124 (1977). The other two factors to be considered are "the risk of erroneous deprivation of such [a private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards and the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Matthews*, 424 U.S. at 335, 96 S.Ct. at 903. The burden on the government, and particularly the FBI, of holding a full hearing in these circumstances for every unsuccessful job applicant would not only be enormous, but also misguided. On balance, the risk to public safety far outweighs the possibility that some potential law enforcement employer might rely on the leads in the FBI file, without more, in rejecting an otherwise qualified applicant who disputed the validity of the information.

We find that no liberty interest was harmed; but beyond that, even if there may have been a liberty interest, due process was amply satisfied.

AFFIRMED.

POSNER, Circuit Judge, concurring.

I join the majority opinion and write separately merely to suggest an additional ground for the decision. We know from *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), that defamation is not a federal constitutional tort. But it does not follow that the common law of defamation is entirely irrelevant to cases where a person complains that a government agency deprived him of liberty by disseminating derogatory falsehoods about him. An established defense in the law of defamation is the defense of privilege in cases where there is a legal or moral duty to communicate, as where an employer gives a character reference to a firm to which his former employee has applied for a job, or a credit bureau discloses to its members someone's credit rating, or, most pertinently, one public officer communicates with another in the discharge of his official duties. See Prosser and Keeton on the Law of Torts § 115, at pp. 826–30 (5th ed. 1984).

Although the privilege is "qualified," meaning it is forfeited if the defendant acts in bad faith, Perry has never tried to prove bad faith and his briefs on appeal do not claim bad faith. Any charge that the FBI either fabricated or maliciously disseminated the derogatory information about Perry that went to the other federal agencies would be highly implausible in the circumstances, so I am not surprised that he has not pursued it seriously. I would deem it abandoned, on the authority of such cases as *Hershinow v. Bonamarte*, 735 F.2d 264, 266 (7th Cir.1984), and *Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983).

If, therefore, Perry does not even have a common law defamation case against the FBI, then I am doubly doubtful whether he has a good federal constitutional case against the FBI. For I do not see how the FBI could reasonably be thought to have deprived him of his liberty of occupation without due process of law through a dissemination of information privileged under

common law principles. Of course the Constitution sometimes puts government officials under tighter reins than the common law would do. But the Supreme Court has made clear that so far as defamation by government officials is concerned, the Constitution puts them under looser reins. Just as it would be fantastic to suggest that a government official could be guilty of depriving a person of liberty of occupation by disseminating truthful, vocationally relevant information about the person, so it would be only a little less fantastic to suggest that an official could be guilty of such a deprivation in a case where his conduct would be privileged if the plaintiff had alleged defamation instead of a violation of the Constitution. That would turn *Paul v. Davis* on its head, by making it easier to bring defamation cases as constitutional than as common law tort cases rather than harder.

Against my analysis it can be argued that the essential holding of *Paul v. Davis* is merely that reputation, the interest that the law of defamation protects, is not liberty or property within the meaning of the due process clause. See 424 U.S. at 712, 96 S.Ct. at 1166. But where defamation is alleged to be the means by which the plaintiff was deprived of liberty, he must prove defamation, subject to generally recognized defenses that are not inconsistent with constitutional policy. Among those is the qualified privilege for internal communications on official business. It is a privilege sensibly designed to foster free communication within government on matters of official business. It is a complete defense to Perry's claim.

I emphatically do not suggest that every common law privilege is absorbed into constitutional tort law. Obviously a blanket immunity for all official misconduct would not be. Some common law privileges, however, clearly are. It is by this route that the absolute immunity of some government officials and the qualified immunity of others from damage suits under section 1983 have gotten into constitutional law; the statute does not refer to any such immunities. See, e.g., *Pierson v. Ray*, 386 U.S.

547, 553–57, 87 S.Ct. 1213, 1217–19, 18 L.Ed.2d 288 (1967); *Cleavinger v. Saxner*, — U.S. —, 106 S.Ct. 496, 500–01, 88 L.Ed.2d 507 (1985). Section 1983 is not self-contained; it was enacted against a background of common law principles which apply to the extent, though only to the extent, that they are consistent with the statute's purposes. See, e.g., *Tenney v. Brandhove*, 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951); *Carey v. Piphus*, 435 U.S. 247, 254–59, 98 S.Ct. 1042, 1047–50, 55 L.Ed.2d 252 (1978); *Taliferro v. Augle*, 757 F.2d 157, 161–62 (7th Cir. 1985); *Parrett v. City of Connersville*, 737 F.2d 690, 695 (7th Cir.1984). A qualified privilege for internal governmental communications on matters of governmental concern fits the purposes of the statute as it has been interpreted by the Supreme Court in relation to defamation.

CUMMINGS, Chief Judge, with whom CUDAHY, Circuit Judge, joins, dissenting.

There is little to add to the majority panel opinion in *Perry I*, 759 F.2d 1271 (7th Cir.1985), to illustrate why I am compelled to dissent. That opinion was based principally on this Court's majority opinion in *Larry v. Lawler*, 605 F.2d 954 (7th Cir. 1978). *Perry I* is also in accord with *Owen v. City of Independence*, 445 U.S. 622, 633–34, 100 S.Ct. 1398, 1406–07, 63 L.Ed.2d 673, which held that dismissal of a government employee because of an allegedly false statement against him deprived the employee of a protected liberty interest without due process of law. While the *en banc* majority strives to distinguish *Larry* on the ground that Larry "had been totally disbarred throughout the government" (p. 9), the effect of the allegedly false FBI report is of course the same here. What government agencies would employ Perry after studying the FBI's comments?

As contemplated in *Perry I*, it may of course turn out that the FBI report was accurate, but in granting summary judgment to defendants, the FBI report has to be presumed false. *Munson v. Friske*, 754 F.2d 683, 690 (7th Cir.1985). Its truth or

falsity must be tested on remand,[1] but at this juncture plaintiff cannot be deprived of his day in court even though he may later be unable to prevail.

The *en banc* majority relies particularly on the *Carmi* and *Thompson* cases [2] where relief was denied to governmental job applicants absent two factors present here, *viz.*, "infringement of a liberty interest such as reputation * * *, [or] impairment of * * * [the applicant's] ability to get another job" (p. 10). Unlike Perry, Carmi was not maligned and did obtain an apparently suitable job (620 F.2d at 674), whereas Thompson, a black claiming racial discrimination, was denied relief because he was not on the Civil Service eligibility list and because the 1972 Amendments to the Civil Rights Act of 1964 were held not to be given retrospective effect. Neither case involved a false government report that kept the plaintiff from jobs he was seeking. While the majority states that here "The FBI has neither injured Perry's reputation nor foreclosed his employment opportunities" (p. 11), these are the very issues that should be decided on remand, not here on summary judgment. Surely too this Court should not be deciding that a United States Attorney's request that Perry be admonished "does not amount to a stigma" (p. 12). Even lay persons would conclude to the contrary! Until there is a hearing before the district court, it cannot be properly said that the FBI has "neither injured Perry's reputation nor imposed a stigma foreclosing his employment opportunities * * *" (p. 16).

As Judge Bork pointed out in *Mosrie v. Barry*, 718 F.2d 1151, 1160–61 (D.C.Cir. 1983), governmental defamation such as occurred here will constitute deprivation of liberty and give rise to a right to procedural due process if, as here, it impairs one's ability to take advantage of a legal right "such as a right to be considered for government * * * employment or a right to seek non-government employment * *." Thus in *Bartel v. F.A.A.*, 725 F.2d 1403, 1415 (D.C.Cir.1984), where Bartel was denied a government job and reemployment at the GS–13 level because of a Federal Aviation Administration official's defamatory letters about him, the court of appeals held that the "district court must entertain Bartel's due process claims for damages attributable to wrongful conduct * * *, along with those [claims] for injunctive relief," and that it had wrongly granted summary judgment for defendants.

In his brief before us, Perry has only sought a remand "for factual development" (Br. 9), and his response to the petition for rehearing likewise only requests "an opportunity [on remand] to refute the charge in the [FBI] report and to clear his name" (Response 15). Therefore there is no need for us to "expunge Perry's allegedly adverse law-enforcement-related record, and then proceed to grant Perry's request, even if we could, to appoint him to one of the federal law enforcement positions he was denied" (p. 9).

I must also disagree with the concurring opinion. The allegations of the third amended complaint must be taken as true on defendants' motion for summary judgment. *Munson, supra; Ellsworth v. City of Racine*, 774 F.2d 182, 184 (7th Cir.1985). Count I charges that the FBI report contains "untrue and malicious information," that it was "a willful and intentional attempt" by the FBI to deny Perry federal employment, and that the FBI's "acts, conduct and behavior * * * were done willfully, intentionally and maliciously" (realleged in that Count's pertinent Second Cause of Action) (R. Item No. 62, pp. 4–5). There is a well-recognized exception to the privilege of publishing employment references when, as here, the false report is made maliciously, *i.e.*, with reckless disregard as to truth or falsity. *Gaines v. Cuna Mutual Insur-*

---

1. The stigmatizing statements in the report were denied by plaintiff (D.Ct. 1–15–81 mem. op. 8, pet. for reh. 4).

2. *Carmi v. Metropolitan St. Louis Sewer District*, 620 F.2d 672 (8th Cir.1980), certiorari denied, 449 U.S. 892, 101 S.Ct. 249, 66 L.Ed.2d 117, and *Thompson v. Link*, 386 F.Supp. 897 (E.D.Mo. 1974).

*ance Society,* 681 F.2d 982, 986 (5th Cir. 1982); *Miller v. Lear Siegler, Inc.,* 525 F.Supp. 46, 60 (D.Kan.1981); *Zuschek v. Whitmoyer Laboratories, Inc.,* 430 F.Supp. 1163, 1166 (E.D.Pa.1977), affirmed, 571 F.2d 573 (3d Cir.1978); Restatement of the Law of Torts 2d § 600. Therefore, the privilege does not apply in this case.

Assuming without deciding that the employment-reference privilege applies in constitutional defamation (*i.e.,* "stigma-plus" cases), Perry has not abandoned the charge that the FBI either fabricated or maliciously disseminated the derogatory information about him, as indicated in the concurrence. See plaintiff's Opposition to Petition for Rehearing 1, 3, 7, 12, 14, 15, which reveals that Perry still contends that the FBI willfully and intentionally (*i.e.,* maliciously)[3] disseminated false information about him. Indeed, in its Memorandum in Support of its Motion for Summary Judgment, the FBI admitted that Perry is alleging that the FBI report contained malicious information about him (p. 5). Similarly, appointed counsel for Perry at the oral argument before us never abandoned Perry's charge that the FBI's report was false and maliciously disseminated. Such matters were to await proof at trial.

Since the *en banc* majority has not seen fit to overrule *Larry*[4] that authority requires reversal and remand in accordance with *Perry I.*

---

**3.** Allegations of willfulness and intent have been deemed by us as akin to malice, *Pape v. Time, Incorporated,* 419 F.2d 980, 982 (7th Cir.1969), but Perry's complaint also specifically alleges malice.

**4.** *Larry* was followed in *Doe v. United States Department of Justice,* 753 F.2d 1092, 1113–14 (D.C.Cir.1985); *Old Dominion Dairy v. Secretary of Defense,* 631 F.2d 953, 966 n. 24 (D.C.Cir.

1980); *Jaffe v. Federal Reserve Bank of Chicago,* 586 F.Supp. 106, 108–09 (N.D.Ill.1984); *Zurek v. Hasten,* 553 F.Supp. 745, 747 (N.D.Ill.1982); *Blank v. Swan,* 487 F.Supp. 452, 455, 456–57 (N.D.Ill.1980).

*Bone v. City of Lafayette,* 763 F.2d 295 (7th Cir.1985), is not contra, because there the defamation did not affect employability (at p. 298).